UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
                                               :

DAVID RAUS, YESSICA NAVARRO,    :   Index No.:
MOYA FERENCHAK, *on behalf of*     :
*themselves and all others similarly situated*,  :

                                    :   **CLASS ACTION COMPLAINT**
                       Plaintiffs,  :
                                    :   **DEMAND FOR JURY TRIAL**

           - against -         :
                                    :

Elements Production, LLC, a New York   :
Limited Liability Company, BangOn!NYC,  :
Brett Herman, an individual, Timothy   :
Monkiewicz, an individual, Tested Contained :
Retreats,  LLC, a Delaware Limited Liability :
Company; and DOES 1 through 50, inclusive. :
                                    :

               Defendants.     :
                                    :
-------------------------------------------------------- X

     Plaintiffs David Raus, Yessica Navarro, and Moya Ferenchak (collectively, "Plaintiffs"),

bring this action on behalf of themselves, and all others similarly situated, and file this Class

Action Complaint against defendants Elements Production, LLC ("Elements Production"),

BangOn!NYC, Brett Herman ("Herman"), Timothy Monkiewicz ("Monkiewicz," referred to

collectively herein with Elements Production, BangOn!NYC and Herman as "Elements

Defendants"), Tested Contained Retreats, LLC ("Tested Retreats," referred to collectively herein

with Elements Production, BangOn!NYC, Herman, and Monkiewicz as "Defendants") and

DOES 1 through 50, inclusive.  Plaintiffs allege the following based on information and belief,

the investigation of counsel, review of public documents, and personal knowledge as to the

allegations pertaining to themselves.

## INTRODUCTION

1.      This class action lawsuit seeks redress for Defendants' failure to properly organize, prepare, and provide ticket purchasers and attendees of the Elements Festival 2021 with the experience Defendants extensively promoted and marketed as being a safe, packaged, multi-day camping and music festival to take place on September 3-6, 2021 in Lakewood, Pennsylvania ("Elements Festival"), featuring, among other things, three full days of specified musical acts, substantial COVID-19 safety protocols, such as a CrowdPass mobile service application ("CrowdPass App") for health screening, Americans With Disabilities Act ("ADA") accessible facilities and experiences, premium, group, and standard camping lodging, where attendees could camp for several nights and enjoy a number of musical acts throughout the festival dates, as well as VIP viewing stages and premium parking passes close to the festival entry for those interested in paying additional money to purchase them.

2.      After its conclusion on September 6, 2021, the Elements Festival quickly achieved media notoriety because attendees had arrived to attend and were greeted with rain-soaked grounds (the Hurricane Ida storm had recently passed through, as Defendants knew or should have known), completely disorganized and disheveled parking areas, insufficient staffing, over ten hours plus waits just to enter into the festival itself (thereby forcing many attendees to miss the Elements Festival's first day of musical acts and experiences despite paying for them), lack of proper COVID-19 screening and neglect of the CrowdPass App marketed for that purpose, and a scarcity of access to food, water and sanitary toilets at times, among other issues. Defendants had essentially ignored Hurricane Ida's arrival in the area, did not provide adequate staffing for the musical festival, did not properly screen attendees for COVID-19, had insufficient food and water supplies, the lodging was not as advertised, and all of this combined

with the lack of basic amenities for attendees created an uncomfortable and dangerous situation. Festival-goers were subjected to extremely long, time-consuming walks in mud-soaked grounds with heavy camping gear and equipment, as part of the nearly ten hour wait just to enter into the festival, during which no food, water, restrooms or proper guidance from anyone affiliated with Defendants was made available. Most attendees missed the first day of musical acts they had paid to see, due to the excruciating wait and physical effort it took just to get into the festival itself.  The COVID-19 protocols that had been advertised to provide safety and security for attendees, such as screening via the CrowdPass App, were also not properly utilized by Defendants, and numerous attendees' vaccination status and/or testing status, and valid identification ("ID") was not checked at all upon entry, putting the health of everyone attending at risk. Once inside, attendees were subjected to extremely unsanitary conditions, unusable handwashing stations, and bathing stations many had paid for such as showers that did not even work. Furthering the misery, Elements Festival security allowed attendees to bring in only one liter of water, but then the festival ran out of its own water provisions by the second day, and access to water thereafter was spotty, putting attendees at risk for dehydration, additional health risks, and more.

3.      Due to the lack of planning, proper health and safety related preparations, poor sanitation, and complete disorganization in terms of the Elements Festival's parking and other aspects of the festival, and based on the up to ten hour plus wait to get into the Elements Festival they had experienced two days earlier, many attendees such as Plaintiffs realized that, due to the disorganized and understaffed parking situation, it would be necessary to leave early in the morning on the third day, and miss the specified musical acts they had paid to see on the third day, in order to escape the unsafe and unsanitary conditions at the Elements Festival. Even then,

attendees' efforts to escape the understaffed, disorganized, and unsanitary festival were hamstrung by the disorganized parking and mud-soaked grounds, where no efforts had been made by Elements Festival's staff or security to make certain parking areas more accessible, and easier to use, such as putting down wood chips to facilitate vehicle access and then drive those vehicles out of the area. Further, none of the festival staff was available to assist attendees seeking to depart on Elements Festival's third day, when their vehicles did get stuck in the mud, and attendees were thus forced to seek the help of a local family in order to escape.  The local family appeared to provide assistance in this circumstance due to their concern for the safety of attendees and the dangerous parking situation that had arisen.

4.    Ticket packages ranged in cost from approximately $350 up to $1,300, which could include, among other things, according to Elements Festival's marketing and advertising, VIP tickets, including expedited check-in, a special raised stage viewing platform, a VIP tea house lounge, free massages, premium liquor bar access, a VIP concierge, along with VIP Parking Passes, none of which was actually provided to VIP ticket purchasers. Upon information and belief, Defendants sold thousands of ticket packages to Elements Festival in total, and the event was ultimately oversold.

5.    Attendees suffered financial damages associated with the purchase of the tickets and/or other expenditures associated with the Elements Festival depending on the ticket packages purchased and their travel arrangements, including their attempts to return home safely and expeditiously after the horrendous experience they encountered there. Not only did ticketholders and attendees shell out hundreds and/or thousands of dollars to purchase tickets to the event, but in order to attend the event, they were required to make transportation arrangements to and from Lakewood, Pennsylvania. Defendants failed to warn attendees about the issues awaiting them at

the festival grounds, such as, without limitation, the long and physically arduous walks and waits for entry, lack of health and safety protocols, including lack of health and safety protocols related to the COVID-19 pandemic, lack of ADA accessible facilities, inadequate access to water and food supplies, and completely disorganized conditions at the festival.

6.      Outrage spread quickly on social media and news outlets, with the websites www.vulture.com and www.edmtunes.com, among others, describing the events as reminiscent of the disastrous Fyre Festival fraud and scandal, which had unfolded years earlier in April and May 2017.

7.      Plaintiffs bring this class action on behalf of all ticket buyers and/or festival attendees wronged by Defendants, and seek damages in excess of $5,000,000 on behalf of themselves and the Class.

## **PARTIES**

8.      Plaintiff David Raus ("Mr. Raus") is, and, at all times relevant to action was, a resident of Wake Forest, North Carolina, and a citizen of the State of North Carolina.

9.      Plaintiff Yessica Navarro ("Ms. Navarro") is, and, at all times relevant to action was, a resident of Wake Forest, North Carolina, and a citizen of the State of North Carolina.

10.      Plaintiff Moya Ferenchak ("Ms. Ferenchak") is, and, at all times relevant to action was, a resident of Philadelphia, Pennsylvania and a citizen of the State of Pennsylvania.

11.      Upon information and belief, defendant Elements Production, LLC is, and, at all times relevant to this action was, a New York Limited Liability Company, with its headquarters in New York, New York.

12.      Upon information and belief, defendant BangOn!NYC is an unincorporated business headquartered in Brooklyn, NY, whose business entity status is presently unknown to

Plaintiffs.

13.    Upon information and belief, defendant Brett Herman is an individual who is a founding partner in BangOn!NYC, an unincorporated business headquartered in Brooklyn, New York, along with Defendant Timothy Timothy Monkiewicz, and, at all times relevant to this action, resided in the state of New York.

14.    Upon information and belief, defendant Timothy Monkiewicz is an individual who is a founding partner in BangOn!NYC, an unincorporated business headquartered in Brooklyn, New York, along with Defendant Brett Herman, and, at all times relevant to this action, resided in the state of New York.

15.    Upon information and belief, Defendant Tested Contained Retreats, LLC is, and, at all times relevant to this action was, a Delaware Limited Liability Company.

16.    The true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants sued herein as DOES 1 through 50, inclusive, are currently unknown to Plaintiffs, who therefore sue Defendants by such fictitious names. Plaintiffs are informed and believe, and thereon allege, that each of the Defendants designated herein as DOES is legally responsible in some manner for the events and happenings referred to herein and caused injury and damage proximately thereby to Plaintiffs as hereinafter alleged. Plaintiffs will seek leave of court to amend this Complaint to reflect the true names and capacities of the Defendants designated hereinafter as DOES when the same have been fully ascertained.

## JURISDICTION AND VENUE

17.    The Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) because there are more than 100 Class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs,

and at least one Class member is a citizen of a state different from Defendants.

18.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because at least one Defendant maintains its principal place of business in this District, and a substantial part of the events giving rise to Plaintiffs' claims took place within this judicial district, including Defendants' marketing and sale of the tickets and other items from this District.

## FACTUAL BACKGROUND

### The Marketing and Advertising of Elements Festival

19.    Scheduled to take place over the labor day holiday weekend (September 3-6, 2021), Defendants marketed and advertised Elements Festival as a three day high end camping, arts and music festival. According to Elements Festival's website, attendees at the Elements Festival could purchase tickets for general admission camping, preset camping, or premium camping, which for additional money provided an exclusive experience that could only be accessed by attendees with premium camping passes and wristbands provided for entry into, and included access to premium restrooms, with flushing toilets, and premium showers. A group camping option was also available for groups that met a minimum number of attendees and paid an extra $5 fee per attendee in the group, with a dedicated on-site manager assigned.  The three full days of musical acts were advertised to include performers such as, without limitation, Diplo, Ganja White Night, Bob Moses, Esseks, Dessert Dwellers, J. Worra, Oona Ogal, and others, with main stage live music acts advertised from 1:00 p.m. to 11:00 p.m. every day of the festival, starting on Friday September 3, 2021 and ending Sunday September 5, 2021. The Elements Festival website also advertised that Elements Festival would be an ADA accessible event to accommodate attendees with disabilities.

20.    Defendants advertised that attendees could arrive to the festival on Thursday

September 2, 2021, if they purchased Early Arrival Passes.  Attendees without such passes could

arrive Friday September 3, 2021 between 10 a.m. and midnight, or Saturday September 4, 2021

between 10 a.m. and midnight.  No attendees were allowed in after those time periods, and

attendees were required to be off festival grounds by noon on Monday September 6, 2021.

21.    In terms of parking for the festival, Defendants specified on the festival website

that General Admission parking was available fifteen to twenty minutes from the festival

grounds by shuttle ride.  Attendees could purchase a pass for Silver Parking, a five minute walk

from festival grounds (changed by Defendants three weeks before the festival, after many

attendees had already made purchases, to a five minute shuttle ride to the festival), or a pass for

Gold Parking, a short one minute shuttle ride from festival grounds.  Defendants also specified

on the festival website that box trucks trailing the parking shuttles would be available for

attendees to safely put their belongings in, to make everything easier for attendees in terms of

parking and getting into the festival from their vehicles.

22.    Defendants also marketed and advertised numerous amenities available to festival

attendees, such as, without limitation, a General Store, which would have basic convenience

items available for purchase, free water stations for attendees, plenty of food vendors on-site, and

activities such as a lake to swim in. Defendants' policies also limited attendees to bringing in no

more than one liter of water into the festival.  Further, Defendants marketed and advertised the

music and camping festival as being on a lakefront property containing a sparkling blue lake that

attendees could swim in during the festival.

23.    For COVID-19 safety protocols, Defendants indicated on the Elements Festival

website that the festival was "Keeping You Safe," as entry into the festival grounds required full

vaccination or proof of a negative PCR lab test within 72 hours of the event, which the website

indicated attendees would be required to submit via the CrowdPass App. On information and belief, the Elements Defendants retained Tested Retreats to organize, plan, and provide the COVID-19 safety protocols listed on the Elements Festival website, among other aspects of the festival, as the means to keep attendees safe from COVID-19 throughout the festival. Defendants indicated on the Elements Festival website that all attendees were required to bring a valid ID in order to access the festival grounds. According to Defendants' website, attendees were not allowed reentry into Elements Festival due to the current circumstance around Covid-19, the festival's testing procedures, and state protocols related thereto.

**The Elements Festival's Failures**

24.    Upon arriving at the Elements Festival, Plaintiffs and attendees were shocked to learn that the experience Defendants advertised fell immensely below the advertised expectations. From the beginning, the Elements Festival did not provide anything close to the experience Defendants had set forth on their website and social media.

25.    As reported on social media and online news sources in its aftermath, Elements Festival was a completely disorganized mess, and did not offer the experience Defendants had advertised, which became apparent immediately upon the attendees' arrival.

26.    Many attendees had planned for and targeted an arrival in the festival area throughout the morning of Friday September 3, 2021, in order to enter the festival at or close to the 1:00 p.m. arrival time on that date, as Defendants had advertised for attendees without Early Arrival Passes. However, upon arrival in the area, due to the complete disorganization, lack of coordination, lack of staffing for parking issues, and poor, muddy conditions at the parking sites, many attendees waited for hours, for some up to ten hours and more, just to enter the festival. In addition, many attendees were forced to walk miles, with heavy items including camping gear

and equipment, because the alleged shuttle ride system Defendants had advertised was not functioning properly at all.  In addition, no food, water, or restrooms were made available to attendees dealing with the parking line waits.  Additionally, attendees who had incurred additional expense to obtain Silver Parking Passes and Gold Parking Passes, were denied the benefits of such passes as access to the advertised Silver and Gold parking areas was completely insufficient.  Thus, many attendees, including without limitation, disabled attendees who had been led to believe the festival had ADA accessible facilities, were forced to incur substantial hardship just to enter the festival, and subjected to waits of up to more than ten hours after they arrived in the area. Due to Defendants' failures which caused the delays, many attendees were forced to miss most if not all of the live musical acts they had paid to see on the festival's first advertised day for musical performances.

27.    Certain attendees had also purchased more expensive VIP tickets to the Elements Festival, which Defendants had advertised as including expedited entry to the festival, among other things. However, even attendees who had purchased the VIP tickets supposedly including expedited VIP entry were forced to wait for more than ten hours just like the rest of the festival's attendees, only to be told at the festival entrance that they needed to wait in another line reserved for attendees with VIP tickets. Neither festival staff nor security was available to inform attendees waiting in the entry lines that there was a separate VIP ticket entry line, and no signage was apparent that would otherwise direct attendees with VIP tickets to a separate line from general admission.

28.     After enduring the hardships caused by the disorganization and chaos related to arrival and parking for the festival, attendees who expected a safe experience based on Defendants' advertising of the safety protocols that allegedly would be in place related to the

COVID-19 pandemic were shocked and dismayed when they realized no such safety protocols were being properly implemented or enforced at all. While Defendants indicated on the festival's website that attendees would all be required to submit proof of either (a) full vaccination as defined by the Center for Disease Control ("CDC") or (b) a negative polymerase chain reaction ("PCR") test result taken within seventy-two hours prior to the festival, via the CrowdPass App, many attendees did not have the CrowdPass App even checked by staff at Elements Festival, and no one at the festival was actually checking attendee IDs to determine whether an actual vaccination status or test result was being provided by the actual attendee seeking entry. Thus, there was a consistent failure to verify that any status or results shown, if attendees were even asked to do so, was verified. On information and belief, Elements Production retained Tested Retreats to provide, among other things, the advertised safety protocols for the festival, including the advertised safety protocols related to COVID-19 screening, but the Elements Defendants and Tested Retreats failed to actually provide any alleged safety protocols properly, creating great concern on the part of Plaintiffs and other attendees, and putting all attendees at risk of preventable exposure.

29.    Once through the entry from parking into the festival, many attendees, who had missed part of or all of the first day's musical acts due to the extensive wait time just to get from the festival's parking areas into the festival itself, and were exhausted due to the parking area issues they had encountered, were subjected to further extremely difficult conditions, for a number of reasons. Attendees had been limited to bringing one liter of sealed bottled water into the festival, but the festival ran out of water to sell to attendees on Saturday, and it was replaced only intermittently with limited access, and in conjunction with the extremely long concession lines throughout the festival, attendees were subjected to thirst, dehydration, and potential

resulting illnesses.  The lines for any type of food and refreshments were excessive, and it could take attendees times exceeding an hour just to attempt to obtain access to food and water at the festival. It appeared to attendees there was limited staffing to address this issue. The General Store, which Defendants had advertised would have basic convenience items for sale, was not readily apparent to attendees, who were often forced to wait in line at various vendor stands for extensive periods to simply get basic supplies such as water.  Sanitation was also extremely poor throughout the grounds, and apparently due to understaffing, urine and feces filled up bathrooms throughout the festival grounds, and washing stations were rarely stocked with any soap products and appeared to never be cleaned during the festival.  This greatly exacerbated health concerns of attendees who had already experienced the lack of advertised COVID-19 protocols at the festival's entry, due to the Defendants' failures.

30.    Attendees who had paid for specific categories of camping types quickly discovered they had not been sold what Defendants had advertised. For example, attendees who had purchased "Group Camping," which was advertised to provide roped off, reserved areas for groups that met a minimum number of attendees and paid an extra $5 fee per attendee in the group, with a dedicated on-site manager assigned, quickly learned their group locations were neither roped off nor reserved exclusively for the group at all and there also was no dedicated on-site manager. Attendees who had purchased "Premium Camping," which was advertised to be an exclusive, separate area from general admission camping and to require a specific wristband for entry into, quickly learned there was insufficient security checking wristbands so the area was not exclusive to attendees who had paid for premium camping at all. In addition, while premium camping was advertised to include indoor showers and indoor restrooms, the showers and restrooms were really just porto-shower and porto-pottie type facilities (which other festivals such

as Electric Daisy Carnival would more accurately advertise as Air-Conditioned controlled portable trailers).

31.    The conditions at the Elements Festival were far from the only issue. A number of the musical acts Defendants had advertised would perform at the festival, and which many attendees had paid to see, such as Esseks, Dessert Dwellers, J. Worra, Oona Ogal, and others, pulled out of the festival and did not even perform there at all.  Furthermore, certain attendees had purchased more expensive VIP tickets, which Defendants had advertised as including access to special viewing areas close to the musical acts. However, for attendees who had purchased the VIP tickets, there was only one festival performance stage out of the numerous stages where security was actually checking that attendees in the special access area had purchased VIP tickets and were thus allowed to be in the area.  Thus, attendees who paid extra money for VIP tickets which had been advertised as entitling them to access the VIP viewing areas for the stages once inside the festival, did not get what was advertised to them at all.

32.    Further, the sparking blue lake Defendants had advertised for swimming and other water activities during the festival was not truly accessible by festival attendees, as Defendants had failed to hire staff and lifeguards sufficient to allow attendees to have access to swim in the large body of water on the property.  In fact, attendees only had access to a small area of knee-deep water that they were allowed to wade in. Even more troublingly, festival staff members available to address attendees' concerns about festival issues were difficult to find. The Elements Festival appeared grossly understaffed and on information and belief, was way oversold in terms of the number of attendees initially expected and those who ultimately attended. Furthermore, while Defendants had advertised Elements Festival as having ADA accessible facilities and experiences, staff at the ADA site on the festival grounds was not responsive to disability-related

issues when disabled attendees brought such issues to their attention.

33.     Based on the issues they had encountered upon arrival at Elements Festival, and the many hours long wait they had endured just to get inside the festival through the entrance from the parking areas, and concerns regarding lack of proper COVID-19 screening, many attendees departed the festival early, in order to avoid being stuck in long lines awaiting departure from the parking areas, and to return home, and many missed most if not all of the specified musical acts on the festival's third day as a result.

34.     Plaintiffs and other Class members sustained damages as a direct and proximate result of Defendants' negligence and other wrongful conduct and omissions in connection with the sale of tickets to and other items associated with the Elements Festival, and promotion and organization of the Elements Festival.

**Plaintiffs' Experience**

35.     Plaintiffs and other Class members relied on Defendants' misrepresentations and omissions regarding the experience and accommodations. Plaintiffs and the Class (as defined below) have been damaged by Defendants' unlawful, unfair, negligent and deceptive conduct and wrongful inaction in that they purchased tickets for, and other items associated with, the Elements Festival, that they would not have otherwise purchased, had Defendants not misrepresented the experience of attending the Elements Festival or warned them of the potential harms caused by attending the event. Defendants did not provide Plaintiffs and the Class with the experience Defendants advertised.

36.     Plaintiff Yessica Navarro, along with her fiancé David Raus, who at all relevant times lived in Wake Forest, North Carolina, have attended a number of music festivals during the last several years, and consistently looked for new and interesting music festivals to attend during

that time. More than a year before Elements Festival 2021 was even set to take place, Ms.
Navarro began following the Elements Festival's instagram account, at the instagram handle
@elementsfestival_, in order to learn more about the festival and what it offered. After Ms.
Navarro spent extensive time and effort researching Elements Festival online at the festival
website, www.elementsfest.us, and on the instagram account, Ms. Navarro and Mr. Raus decided,
based on Defendants' representations, to purchase VIP tickets to attend the festival, which had
been advertised to include, among other things, expedited VIP entry and special access to viewing
areas for the festival's music acts.  Ms. Navarro and Mr. Raus also purchased a premium camping
package for the festival which Defendants advertised to include, among other things, a wristband
which provided exclusive access to the premium camping area, and indoor showers and indoor
bathrooms, all advertised to be separate and apart from the festival's General Admission camping
areas and attendees. Ms. Navarro and Mr. Raus paid $1,269.90 in total for the tickets and parking
and camping passes for the festival.

37.     As the date of the festival approached, Ms. Navarro and Mr. Raus made plans to
travel to Lakewood, Pennsylvania, where the festival was to take place, from their home in Wake
Forest, North Carolina. Although Ms. Navarro and Mr. Raus had purchased parking passes for the
Silver Parking area, which Defendants had advertised was located within a five minute walk of
the festival entry, they received an email from Elements Defendants approximately three weeks
before the festival was scheduled to start, indicating the Silver Parking area would instead
actually be a five minute shuttle ride from the festival's entry location. As they traveled to
Lakewood from Wake Forest, Ms. Navarro and Mr. Raus were particularly excited to see a
number of the musical acts Defendants had advertised would be performing, including acts such
as Chris Lake, Bonobo, Yotto, Walker & Royce, Diplo, LP Giobbi, and Claude Vonstroke,

among others.

38.    After making the long drive from North Carolina to Lakewood, Pennsylvania to attend the festival, Ms. Navarro and Mr. Raus were shocked upon their arrival at the festival area at 10:15 a.m. on September 3 to learn of the completely disorganized, inefficient, and troubling parking situation that had arisen. Specifically, when Ms. Navarro and Mr. Raus arrived in their vehicle to park, no festival staff was available to help them, and there were no signs directing them to the proper location for them to park their vehicle. Thus, upon arrival, with no direction from anyone associated with the festival, and no signs providing any guidance whatsoever, Ms. Navarro and Mr. Raus were left with no choice but to follow a long line of cars waiting to get to the festival parking. Amazingly, Mr. Raus was even forced to direct traffic at times, in order to attempt to provide assistance to the parking disaster unfolding, because Defendants provided no such direction or guidance. One Ms. Navarro and Mr. Raus made it to a parking lot, which was not the Silver Parking area they had paid for, after a nearly seven hour wait in the vehicle line, they encountered festival staff for the first time there, who told them to park at that area and that they must carry their own gear and equipment about a half mile through muddy conditions in order to get to the actual Silver Parking area. This instruction from festival staff was extremely frustrating for Ms. Navarro and Mr. Raus, who had already made the long drive to the area before encountering the excessive wait due to the parking conditions Defendants' failures created, and despite their own efforts, they did not arrive to the Silver Parking area they were supposed to have access to until approximately 5:30 p.m. After Ms. Navarro and Mr. Raus were forced to carry all their camping gear and other belongings from their car, and walk in mud down a road for at least half a mile to the actual Silver Parking area, they encountered a fellow festival attendee there who had a microphone and was telling all attendees waiting in that area to get in line in

order to enter the festival via a shuttle bus ride.  At that location, Ms. Navarro and Mr. Raus were then forced to wait in line for nearly three more hours just to get to the front of the line in order to get a shuttle bus to the festival entry. However, when they arrived at the front of the line at the Silver Parking area in order to get on a shuttle bus, after waiting nearly three hours, only then did a festival staff member inform them that, since they had paid extra money for VIP tickets, that they should get out of that line as another staff member handling VIP ticketholders would assist them.

39.    Shortly thereafter, a festival staff member walking through the crowd of attendees toward the front of the attendee line that had accumulated in the Silver Parking area told Ms. Navarro and Mr. Raus that they should proceed to a table for VIP ticketholders. After Ms. Navarro and Mr. Raus followed that direction, only then, after an excruciating wait of more than nine hours since they had arrived in the festival area to attempt to park, did Ms. Navarro and Mr. Raus finally have their bags checked, and they were provided with wristbands to enter the festival and access to the shuttle bus which ultimately dropped them at the festival entry. During the entire more than nine and a half hour wait Ms. Navarro and Mr. Raus endured, no adequate guidance from any festival staff was provided to them, and no food, water or restrooms was made available to them either. The festival staff Ms. Navarro and Mr. Raus did encounter was rude and even shouted profanities at them during this part of the ordeal.

40.    As they finally went through the screening for entry to the festival, prior to getting on the shuttle bus that would drop them at the entry, Ms. Navarro and Mr. Raus were shocked to learn that the safety protocols Defendants had advertised for COVID-19 related issues were really not being enforced. While Ms. Navarro and Mr. Raus understood from Defendants' advertising that vaccination verification documents or testing results for attendees would be demonstrated to

festival security through the CrowdPass App on attendees' mobile phones, and the QR Code contained therein, it did not appear to Ms. Navarro and Mr. Raus that the QR Codes on attendees' phones were actually being scanned by Elements Festival's staff members at all. Even where the CrowdPass App was checked by staff, it did not appear that any steps were taken by staff to determine that the person listed in the CrowdPass App on the mobile phone shown was actually the person listed therein, through cross-checking a valid ID. While Defendants had advertised the CrowdPass App as a useful and efficient method to scan attendees for COVID-19 safety purposes, if the QR Code in the CrowdPass App was not being checked or the ID of the person showing the QR Code was not being checked, the staff, including Tested Retreats, which on information and belief was retained by Elements Defendants for that purpose, among others, was not doing their job to protect the safety of attendees. Neither Ms. Navarro nor Mr. Raus was asked to show ID upon entry to the festival, which Defendants had advertised would be required for entry, and which greatly raised their concerns about a complete lack of proper COVID-19 safety protocols at the festival and the dangers of attending it, upon their arrival there.

41.    Due to the delays caused by Defendants, Ms. Navarro and Mr. Raus were not able to enter the festival until after 9:00 p.m. on Friday September 3, 2021, and needed to set up their campsite at that time, and thus missed all of the musical acts who performed on that date and whom Ms. Navarro and Mr. Raus had purchased tickets to see perform. In particular, Ms. Navarro and Mr. Raus wanted to watch Walker & Royse perform during the schedule of acts set for Friday September 3.

42.    Inside the festival, Ms. Navarro and Mr. Raus learned that the premium camping Defendants had advertised as separate and apart from General Admission attendees, with exclusive wristband access, was not truly exclusive as advertised. There was nothing separating

General Admission attendees from accessing the premium camping area Ms. Navarro and Mr. Raus were provided, other than a single staff member at one such area for an improperly limited period of time, and no festival staff was adequately checking wristbands for this purpose. Exhausted from the parking area ordeal, and frustrated due to being forced to miss the entire first day of musical acts as a result of Defendants' failures, Ms. Navarro and Mr. Raus worked to set up camp as best they could in the pitch black darkness due to the time of night of their arrival at the campsite, and went to sleep as soon as possible there.

43.     By Saturday, September 4, Elements Festival's unsanitary conditions and lack of proper staffing to handle the issue were completely apparent to Ms. Navarro and Mr. Raus. While Defendants had advertised indoor showers and indoor restrooms available to attendees who purchased premium camping packages, such as Ms. Navarro and Mr. Raus, these facilities were essentially porto-showers and porto-potties, and by 3:00 p.m. Saturday the showers at the premium camping site did not work. Further, the problem was exacerbated because there were only five restrooms for the more than one thousand people that appeared to have access to the premium camping area. The limited number of porto-potties that were available to attendees in the premium camping area were already filthy by Saturday morning, and Ms. Navarro and Mr. Raus witnessed no staff assigned to do any cleaning or sanitation on the limited number of porto-showers and porto-potties Defendants made available to them in this area. The problematic sanitation issues continued throughout the remainder of the time Ms. Navarro and Mr. Raus spent at the festival.

44.     Ms. Navarro and Mr. Raus also experienced significant delays during their time inside the festival on its second day, by being forced to wait in long lines simply to get basic supplies such as water, which the festival ran out of for a time on Saturday.  Mr. Raus specifically

waited in line for an hour just to get water on Saturday September 4.  It appeared to Ms. Navarro and Mr. Raus this was due to insufficient staffing and Defendants' failure to obtain sufficient supplies. Furthermore, Ms. Navarro and Mr. Raus were never made aware of any General Store at the festival, as Defendants had advertised, and to the best of their knowledge, the advertised General Store for the festival never came to fruition. Put simply, basic amenities such as water were not readily and consistently available to Ms. Navarro and Mr. Raus while inside the festival, due to Defendants' failures to make such supplies readily accessible for attendees.

45.    By early Sunday morning, Ms. Navarro and Mr. Raus, who had originally planned to depart the festival at its completion on Monday September 6, 2021, felt forced to attempt to depart early Sunday due to all of the issues with the festival, and based on concerns created by the parking issues on their arrival, that they simply would not be able to leave at all if they attempted to leave Monday with the rest of the attendees once the festival concluded.  Ms. Navarro and Mr. Raus also continued to be extremely concerned about their health and safety due to the lack of proper COVID-19 screening protocols for festival entry. Rumors had been circulating among attendees that another seven hour or more wait would be part of any attempted departure on Monday, and even festival staff told Ms. Navarro and Mr. Raus that could be the case, so they were left with no choice but to depart early in order to attempt to escape the festival grounds. Nonetheless, even on Sunday morning, it still took Ms. Navarro and Mr. Raus over three hours to depart the festival grounds, and their departure included trekking long distances through a mud-filled parking lot witnessing numerous vehicles of other attendees stuck in the mud and needing towing services from a local family, who was willing to provide such services to attendees experiencing difficulties, because neither the festival nor its staff provided any such assistance. Due to the early departure Ms. Navarro and Mr. Raus were forced into, they missed several

musical acts they specifically purchased tickets to see, who performed on Sunday September 5, such as Diplo, LP Giobbi, and Claude Vonstroke.

46.     After their departure, on the morning of Sunday September 5, 2021, Ms. Navarro and Mr. Raus were completely exhausted from the difficult and horrible experience they had encountered at Elements Festival. Although they wanted to return to their home in Wake Forest, North Carolina, as soon as possible, they were exhausted and were left with no choice, due to safety concerns resulting from fatigued driving, but to stop and get a hotel room in Harrisburg, Pennsylvania, to recover, rather than driving such a long distance through exhaustion. They incurred additional unanticipated expenses as a result.

47.     Shortly after returning home, Ms. Navarro and Mr. Raus wrote the Elements Defendants an email requesting a full refund of all the parking ticket, entrance ticket, and camping ticket expenses they incurred as a result of attending Elements Festival. After several weeks, they received a response to this email wherein the Elements Defendants indicated a refund would be provided to Ms. Navarro and Mr. Raus for the Silver Parking passes only, but no refunds for any other expenses they incurred. To date, Ms. Navarro and Mr. Raus have not received any refund, even the partial refund for parking the Elements Defendants indicated would be provided.

48.     Plaintiff Moya Ferenchak, who at all relevant times lived in Philadelphia, Pennsylvania, has attended a number of music festivals during the last several years, and after learning of the musical acts set to perform at Elements Festival, and the camping and other experiences Defendants advertised would be provided, was excited to attend the festival along with her partner and a number of other people. Ms. Ferenchak purchased a General Admission ticket bundle, for Group Camping, and a general parking pass. Ms. Ferenchak paid approximately

$380 for her ticket, and parking and camping passes.

49.     Ms. Ferenchak arrived in her car in the area of the festival at around 1:00 p.m. on September 3, 2021, along with her partner, and the disorganization and disarray of the parking situation was immediately apparent to Ms. Ferenchak, who was upset and dismayed by the situation. Specifically, after arriving in the area of the festival on September 3 in her car, Ms. Ferenchak waited along with her partner in a long line of cars, barely moving at all, with no apparent end in sight. There was also insufficient festival staff available to help them, and no signage which could serve as a guide to the proper parking area, even if the rest of the cars attempting to park were moving, which they barely were.  The line of cars Ms. Ferenchak and her partner encountered turned out to be about four and a half miles long, and moved extremely slowly the entire time they were in it, and this was just to be able to park their car. Once Ms. Ferenchak and her partner were actually able to park their car, after a long and exhausting wait, they were forced to wait in a long line of other attendees, for several hours, only to be told when they reached its end that shuttle buses to take them to the festival were not coming to that location at all.

50.     Ms. Ferenchak, who has severe rheumatoid arthritis, and several other autoimmune conditions, and is thus disabled, had purchased tickets to Elements Festival, in part based on Defendants' representations that the event would provide ADA accessible facilities and experiences. During the long, multi-hour wait in line, after she exited her car to attempt to get on a shuttle bus to get to the festival entry, Ms. Ferenchak had an extremely difficult and painful time waiting, especially with no food, water, or bathrooms made available to attendees such as her during that extremely long waiting period, which had followed the lengthy wait in line in the car.  Due to the length of the walk, through mud-soaked grounds, and in part due to her disability,

Ms. Ferenchak was in severe pain during the walk to the new shuttle bus area.

51.     After several long and painful hours waiting to get on a shuttle bus to take her and her partner to the festival entry, only then did festival staff first inform Ms. Ferenchak and her partner that the shuttle business were actually not coming to that parking area, but instead they were required to make an approximately mile long walk to another parking area in order to get on a shuttle bus to the festival entry. Once in the area where the shuttle buses were actually taking attendees to the festival entry, after enduring many hours of waiting and physical hardship, due in part to her disability and the obvious fact the parking at Elements Festival was not ADA accessible, Ms. Ferenchak was shocked and dismayed when she realized the COVID-19 safety protocols Defendants had advertised would be required for festival entry were not actually being implemented at all. The CrowdPass App for Ms. Ferenchak and her partner were not even checked by festival staff or security, and it appeared to them that most attendees seeking to get on the shuttle buses to the festival did not have their CrowdPass App checked either. Where Ms. Ferenchak did witness an attempt by staff associated with the festival to check on the CrowdPass App, it appeared to her the scanners were not even working, and sometimes festival staff appeared to just eyeball the CrowdPass App on an attendee's phone screen, without truly checking. Tested Retreats, which Plaintiffs are informed and believe was hired by the Elements Defendants to, among other things, provide COVID-19 screening for Elements Festival attendees, did not appear to be doing proper screening work at all.

52.     Prior to boarding the shuttle bus to travel to the festival entry, Ms. Ferenchak was asked by festival staff to put her camping gear and other belongings in a U-Haul truck that she was told would carry them to the festival entry. When she went to retrieve her gear and belongings at the actual festival entry, however, it appeared they had simply been dumped on the

ground by festival staff and one of her shoes that she had included with her belongings in the U-Haul was lost and never found thereafter.

53.    By the time Ms. Ferenchak and her partner were actually able to enter the festival, it was sometime around 10:00 p.m. on the night of September 3, approximately nine hours after they had arrived in the festival area to park, and her body was in so much pain she could barely walk, let alone carry her camping gear and belongings.  Her shock and dismay at the situation she had encountered was furthered when she learned the Group Camping she had purchased was not as advertised at all.

54.    Specifically, the Group Camping, which had been advertised to provide roped off, reserved areas for groups that met a minimum number of attendees and paid an extra $5 fee per attendee in the group, with a dedicated on-site manager assigned, provided no such thing. Instead, Ms. Ferenchak quickly learned the group camping area she and others had reserved was not roped off at all, and was not an exclusive, separate area, but could be accessed by anyone. Additionally, there was no dedicated on-site manager for Ms. Ferenchak's camping group, as Defendants had indicated would be provided.  In fact, several of Ms. Ferenchak's friends who had also purchased Group Camping as part of her group, could not even find a spot to camp in her area by the time they were finally able to enter the festival around 2:00 a.m. on September 4, and so they simply had no choice but to leave.

55.    Ms. Ferenchak felt pain and discomfort due to the difficulties she encountered on the festival's first day, and she also had serious concerns during her entire time inside the festival due to the lack of adequate COVID-19 safety protocols at entry.  In addition, Ms. Ferenchak also discovered that the conditions inside by the morning of the festival's second day were unsanitary, as the limited number of porto-potties available were overflowing with urine and feces, which

further distressed her and made her feel sick as well.  Despite the unsanitary conditions that were apparent to anyone, it did not appear to Ms. Ferenchak that any staff from the festival was assigned to clean them or had made any effort to clean them.

56.      Ms. Ferenchak, whose disability causes her great pain at times, and was greatly exacerbated by the long and difficult entry to the festival due to the disorganized parking issues, attempted to get help at the festival by visiting the specified ADA help center location there, due to her concerns about her anticipated departure from the festival on Sunday September 5.  While Ms. Ferenchak explained to staff at the ADA help center location her situation and specifically requested help departing from the festival, as she anticipated it would require long stretches of walking and long wait times like during entry, the festival staff at the ADA help center was not helpful or responsive in a meaningful way. Instead, the staff members simply told her she could text them when she wanted to depart but when she did so on Sunday there was no response.

57.      By early Sunday morning, Ms. Ferenchak, who had originally planned to depart the festival at its completion on Monday September 6, felt forced to attempt to depart early Sunday due to all of the issues with the festival, and based in part on concerns created by the disastrous parking issues she had encountered when she had arrived two days earlier. Ms. Ferenchak also heard rumors circulating among attendees that another long wait would be part of any attempted departure, so she was left with no choice but to depart early in order to attempt to escape the festival grounds, hopefully before the rest of the attendees also attempted to do so.

58.      Since the staff at the ADA help center did not respond to her text messages seeking help with her departure, Ms. Ferenchak was forced to haul her camping gear and other belongings over a mile through mud-filled grounds, which was absolutely exhausting and caused her further pain.  No festival staff provided any help to her with her departure, and no shuttle was

provided to take her to her car. Once at her car, due to the poor conditions in the parking areas, even still by the festival's third day, Ms. Ferenchak's car got stuck in the mud and she and her partner had to pay a local family to help them get the car moving again, just to attempt to leave the festival's parking areas. Due to the poor conditions, disorganization, lack of adequate staffing, and other issues, even though Ms. Ferenchak left the festival on Sunday morning, it still took her over three hours to depart the festival grounds. Additionally, during her departure, she witnessed numerous vehicles of other attendees also stuck in the mud and needing towing services from the local family who had helped her and her partner depart the parking area. Due to the early departure from Elements Festival that Ms. Ferenchak was forced into, she missed several musical acts she had specifically purchased tickets to see, who performed on Sunday September 5, such as Claude Vonstroke.

59.    Exhausted and in pain, as well as extremely frustrated and disappointed by the disastrous festival she had encountered, Ms. Ferenchak and her partner drove home to conclude the festival weekend.

## CLASS ACTION ALLEGATIONS

60.    Plaintiffs bring this action, on behalf of themselves and all others similarly situated, as a class action pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), as applicable, and (c)(4). Upon information and belief, Defendants sold thousands of Elements Festival tickets. The advertising and representations for the Elements Festival tickets and associated items were uniform throughout the class period.

61.    Pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), as applicable, and (c)(4), Plaintiffs seek certification of the following class: All persons who purchased tickets to and/or attended the Elements Festival (the "Class").

62.    Excluded from the Class are persons who purchased the tickets for purposes of resale; any entity in which Defendants have a controlling interest, is a parent or subsidiary, or which is controlled by Defendants, as well as the officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns of Defendants. Also excluded are the judges and court personnel in this case and any members of their immediate families. Plaintiffs reserve the right to redefine the proposed Class if discovery and further investigation reveal that the Class should be expanded or otherwise modified. Plaintiffs reserve the right to establish subclasses as appropriate.

63.    This action is brought, and may properly be maintained, as a class action under Fed. R. Civ. P. Rule 23 because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable. This action satisfies the predominance, typicality, numerosity, superiority, and adequacy requirements of these provisions.

(a) **Numerosity:** The Class is so numerous that the individual joinder of all members is impractical under the circumstances of this case. While the exact number of Class members is unknown to Plaintiffs at this time, upon information and belief, thousands of people purchased tickets for, and/or attended, the Elements Festival.

(b) **Commonality**: Common questions of law and fact exist as to all members of the plaintiff class and predominate over any questions that affect only individual members of the Class. The common questions of law and fact include, but are not limited to:

(i)    Whether Defendants breached any implied or explicit contractual obligations to ticket buyers and to attendees of Elements Festival;

(ii)    Whether Defendants negligently misrepresented various facts regarding the Elements Festival or were otherwise negligent or grossly negligent; and

(iii) Whether Defendants created an unsafe environment at the Elements

Festival; and

 (iv)  Whether Defendants violated a state consumer protection statute, the New York General Business Law;

 (v)  Whether, as a result of Defendants' misconduct as alleged herein, Plaintiffs and the Class are entitled to damages, restitution and/or other remedies to which Class members are entitled as a result of Defendants' wrongful conduct, and, if so, the amount and nature of such relief.

(c) **Typicality:** Plaintiffs' claims are typical of the claims of the Class. Plaintiffs and the members of the Class sustained damages arising out of Defendants' wrongful and fraudulent conduct as alleged herein.

(d) **Adequacy:** Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have no interest that is adverse to the interests of the other Class Members.

(e) **Superiority:** A class action is superior to other available means for the fair and efficient adjudication of this controversy. Because individual joinder of all members of the class is impractical, class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without unnecessary duplication of effort and expense that numerous individual actions would engender. The expenses and burdens of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while important public interests will be served by addressing the matter as a class action. The cost to and burden on the court system of adjudication of individualized litigation would be substantial, and substantially more than the costs and burdens of a class action. Class litigation would also prevent the potential for inconsistent or contradictory judgments.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**(Breach of Contract/Third Party Beneficiaries As Against Elements Production,**

28

**BangOn!NYC, Herman, and Monkiewicz Only)**

64.     Plaintiffs reallege and incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

65.     Plaintiffs bring this claim individually and on behalf of the members of the Class against Defendants Elements Production, BangOn!NYC, Herman and Monkiewicz.

66.     Plaintiffs and the members of the Class entered into contracts with Elements Production, BangOn!NYC, Herman and Monkiewicz to provide a three day camping and musical festival for money. Plaintiffs who purchased tickets to Elements Festival provided payment in consideration for Elements Production's, BangOn!NYC's Herman's, and Monkiewicz's promise to provide a safe and secure music festival with specified musical performers, and otherwise fully performed their obligations under the contracts. Plaintiffs who attended the Elements Festival with tickets purchased by others, and expended monies associated with the Elements Festival, such as travel and other accommodations, are third party beneficiaries of ticket purchasers' contracts as those contracts were made to benefit such attendees, and fully performed any obligations on their behalf.

67.     As alleged herein, Defendants Elements Production, BangOn!NYC, Herman and Monkiewicz breached the contracts with Plaintiffs and the members of the Class by, among other things, failing to provide adequate parking, reasonable access to the festival's first day, adequate COVID-19 screening, sufficiently accessible water, specified musical acts and reasonable access to their vehicles for a timely departure.

68.     Plaintiffs and the members of the Class expended money to purchase their tickets and/or associated items with the Elements Festival.

69.     As a direct and proximate result of Defendant Elements Production's,

BangOn!NYC's, Herman's, and Monkiewicz's breach of contract, Plaintiffs and the members of the Class were damaged in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
### (Breach of Implied Covenant of Good Faith and Fair Dealing As Against Elements Production, BangOn!NYC, Herman, and Monkiewicz Only Only)

70.     Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

71.     Plaintiffs bring this claim individually and on behalf of the members of the Class against Elements Production, BangOn!NYC, Herman and Monkiewicz.

72.     Plaintiffs and the members of the Class entered into direct and/or third party beneficiary contracts with Elements Production, BangOn!NYC, Herman and Monkiewicz to provide a three day camping and musical festival for money. Plaintiffs who purchased tickets to Elements Festival provided payment in consideration for Elements Production's, BangOn!NYC's, Herman's and Monkiewicz's promise to provide a safe and secure music festival with specified musical performers, and otherwise fully performed their obligations under the contracts.

73.     As alleged herein, Elements Production's, BangOn!NYC's, Herman's and Monkiewicz's acts and omissions and failure to provide adequate parking, reasonable access to the festival's first day, adequate COVID-19 screening, sufficiently accessible water, specified musical acts and reasonable access to their vehicles for a timely departure interfered with Plaintiffs and the members of the Class right to receive the benefits of the contracts and constituted a breach of its duty of good faith with Plaintiffs and members of the Class.

74.     Plaintiffs and the members of the Class expended money to purchase their tickets and other items associated with the Elements Festival.

75.     As a direct and proximate result of Elements Production's, BangOn!NYC's,

Herman's and Monkiewicz's breach of the implied covenant of good faith and fair dealing, Plaintiffs and the members of the Class were damaged in an amount to be proven at trial.

## THIRD CAUSE OF ACTION

### (Negligence)

76.     Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

77.     Plaintiffs bring this claim individually and on behalf of the members of the Class against Defendants.

78.     Defendants owed duties to Plaintiffs and the members of the Class as paying customers and attendees of the Elements Festival to use reasonable care to provide true, reliable and safe accommodations of food, water, shelter, and security at the Elements Festival. These duties existed because Plaintiffs and members of the Class were the foreseeable and probable victims of the inadequate and unsafe environment Defendants created. Defendants' duties also arose from their position of having not only superior but unique knowledge in the consumer transactions at issue about the environment at the Elements Festival and they had a duty to Plaintiffs to not place them in a unsafe situation without adequate safety protocols related to COVID-19 and in unsanitary conditions without adequate access to supplies such as drinking water. These duties are independent of and extraneous to any contractual obligations that may exist between Elements Production and Plaintiffs.

79.     Defendants, breached their duties to Plaintiffs and the members of the Class by failing to provide adequate safety protocols related to COVID-19 and reasonable access to water at the Elements Festival, by failing to use reasonable care in properly organizing Elements Festival with the proper vendors, by placing attendees into a dangerous environment, and by making

incorrect representations and omitting material information about the experience they would provide.

80.     Plaintiffs and members of the Class suffered foreseeable pecuniary and non-pecuniary damages associated with the Elements Festival.

81.     But for Defendants' wrongful and negligent breach of their duties owed to Plaintiffs and members of the Class, Plaintiffs and members of the Class would not have suffered pecuniary and non-pecuniary damages.

82.     As a direct and proximate result of Defendants' negligence, Plaintiffs and the members of the Class incurred pecuniary and non-pecuniary damages, such as pain and suffering and emotional distress, in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION
#### (Gross Negligence)

83.     Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

84.     Plaintiffs bring this claim individually and on behalf of the members of the Class against Defendants.

85.     Defendants owed duties to Plaintiffs and the members of the Class as paying customers and attendees of the Elements Festival to use reasonable care to provide adequate safety protocols related to COVID-19 and reasonable access to water at the Elements Festival. These duties existed because Plaintiffs and members of the Class were the foreseeable and probable victims of the inadequate and unsafe environment that Defendants created. Defendants' duties also arose from their unique position of having not only superior but unique knowledge in the consumer transactions at issue about the environment at the Elements Festival and they had a duty to Plaintiffs to not place them in a unsafe situation without adequate safety protocols related to

COVID-19 and reasonable access to water. These duties are independent of and extraneous to any contractual obligations that may exist between Defendants and Plaintiffs.

86.    Defendants breached their duties to Plaintiffs and the members of the Class by failing to provide adequate safety protocols related to COVID-19 and reasonable access to water at the Elements Festival, by failing to use reasonable care in properly organizing Elements Festival with the proper vendors, by placing attendees into an unsafe environment, and by making incorrect representations and omitting material information about the experience they would provide.

87.    Plaintiffs and members of the Class suffered foreseeable pecuniary and non-pecuniary damages associated with the Elements Festival.

88.    But for Defendants' wrongful and grossly negligent breach of their duties owed to the Plaintiffs and members of the Class, Plaintiffs and members of the Class would not have suffered pecuniary and non-pecuniary damages.

89.    Defendants' acts and omissions were wanton and in disregard of the rights of Plaintiffs and members of the Class. Defendants recklessly placed Plaintiffs and members of the Class in an inadequate or unsafe environment without adequate provisions. As a direct and proximate result of Defendants' gross negligence, Plaintiffs and the members of the Class, incurred pecuniary and non-pecuniary damages, such as pain and suffering and emotional distress, in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### (Negligent Misrepresentation)

90.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

91.    Plaintiffs bring this claim individually and on behalf of the members of the Class against Defendants.

92.     As alleged herein, Defendants made numerous incorrect representations of material fact with regard to Elements Festival.

93.      Specifically, Defendants represented, among other things, that:  (1) for safety purposes related to COVID-19, to gain entrance to Elements Festival, attendees would be required to show proof of full vaccination or a negative PCR lab test within 72 hours of the event, in conjunction with a valid ID to access the festival entrance (2) musical acts, such as, without limitation, Esseks, Dessert Dwellers, J. Worra, and Oona Ogal, among others, would be performing as advertised from 1:00 p.m. to 11:00 p.m. each day of the festival (3) free water stations would be readily available to attendees (4) "Group Camping" was available for groups that met a minimum number of attendees and paid an extra $5 per attendee in the group, with a dedicated on-site manager assigned  (5) "Premium Camping" was available for attendees who paid extra for premium passes, which was an exclusive, separate area from general admission camping and required a specific wristband for entry into, and also included indoor showers and indoor restrooms, and (6) Elements Festival would be an ADA accessible event to accommodate attendees with disabilities.

94.     Defendants' representations were incorrect.

95.     Defendants were negligent in making the representations because they should have known the representations were incorrect and that they could not and/or would not provide the goods and services they had represented to Plaintiffs and consumers.

96.     Plaintiffs and the members of the Class acted in reliance on the incorrect, material representations made by Defendants, by buying tickets associated with the Elements Festival, which caused them injury. Plaintiffs and the members of the Class would not have purchased tickets and/or expended any other money in connection with the Elements Festival if they had

known that they were not going to be receiving the security, accommodations, performances, and other amenities they were told they were going to have access to at the Elements Festival.

97.    Plaintiffs and the members of the Class were consequently injured when Elements Festival's disorganized parking and lack of adequate staffing led to waits of up to more than ten hours on the festival's first day, just to get through the entry on the festival's first day, due to under-preparation, insufficient staffing, and inadequate facilities, and then once in the festival did not receive the security, accommodations, performances, and other amenities they were told they were going to have access to at the Elements Festival.

98.    As a result of Defendants' incorrect representations and omissions, Plaintiffs and the members of the Class were damaged in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION
### (Unjust Enrichment)

99.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

100.    Plaintiffs bring this claim individually and on behalf of the members of the Class against Defendants.

101.    By their wrongful acts and omissions regarding the Elements Festival, as discussed above, Defendants were unjustly enriched at the expense of Plaintiffs and the members of the Class, who did not receive the benefit for which they were promised and they were entitled – as alleged in detail above – for attendance to the advertised music and camping festival, and thus, Plaintiffs and the members of the Class were unjustly deprived.

102.    Defendants were enriched by, among other things, the financial benefit from sales of tickets to, and associated items for, the Elements Festival, and for services they were supposed to but not did provide.

103.    It would be inequitable and unconscionable for Defendants to retain the profit, benefit and other compensation they obtained from the unlawful, unfair, negligent and deceptive conduct alleged herein.

104.    Plaintiffs and the members of the Class seek restitution from Defendants, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct.

### SEVENTH CAUSE OF ACTION
#### (Violation of N.Y. Gen Bus. Law § 349, *et seq.*)

105.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

106.    Plaintiffs bring this cause of action on behalf of themselves and all of the members of the Class as the deceptive practices with respect to the entire Class occurred in and emanated from New York, where Elements Production, BangOn!NYC, and Herman and Monkiewicz as founding partners operating BangOn!NYC were headquartered, conducted business, had extensive ties, and/or produced and disseminated the representations and advertising related to the Elements Festival. Email communications from the Elements Defendants to Plaintiffs and members of the Class regarding the services at Elements Festival and what would be provided indicated the emails from Elements Defendants were disseminated from Brooklyn, New York, where they were headquartered.

107.    Plaintiffs and members of the Class are individuals that paid for Elements Festival tickets and other associated items with the Elements Festival for personal purposes.

108.    Defendants engaged in deceptive acts or practices in the conduct of their business, trade, and commerce or furnishing of services, in violation of N.Y. Gen. Bus. Law § 349 in the promotion of the Elements Festival and sale of the Elements Festival tickets and other associated

items with the Elements Festival, including by misrepresenting the characteristics, and qualities of the Elements Festival as alleged herein, such as representing that: (1) for safety purposes related to COVID-19, to gain entrance to Elements Festival, attendees would be required to show proof of full vaccination or a negative PCR lab test within 72 hours of the event, in conjunction with a valid ID to access the festival entrance (2) musical acts, such as, without limitation, Esseks, Dessert Dwellers, J. Worra, and Oona Ogal, among others, would be performing as advertised from 1:00 p.m. to 11:00 p.m. each day of the festival (3) free water stations would be readily available to attendees (4) "Group Camping" was available for groups that met a minimum number of attendees and paid an extra $5 per attendee in the group, with a dedicated on-site manager assigned  (5) "Premium Camping" was available for attendees who paid extra for premium passes, which was an exclusive, separate area from general admission camping and required a specific wristband for entry into, and also included indoor showers and indoor restrooms, and (6) Elements Festival would be an ADA accessible event to accommodate attendees with disabilities.

109.    Defendants engaged in deceptive acts or practices in the conduct of their business, trade, and commerce or furnishing of services, in violation of N.Y. Gen. Bus. Law § 349 by concealing, suppressing and omitting material facts, including, among other things, about the lack of preparedness of parking, accommodations, sanitation, and other provisions at the Elements Festival, lack of adequate screening for COVID-19, and that Defendants had created an unsafe environment at the Elements Festival.

110.    Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the characteristics and quality of the Elements Festival.

111.    Defendants recklessly disregarded the rights of the Plaintiffs and the Class.

112.    As a direct and proximate result of Defendants' deceptive and unlawful acts and practices, Plaintiffs and the members of the Class have suffered and will continue to suffer injury and damages.

113.    Defendants' deceptive and unlawful acts and practices complained of herein, affected the public interest and consumers at large.

114.    The above deceptive and unlawful practices and acts by Defendants caused substantial injury to Plaintiffs and the members of the Class that they could not reasonably avoid.

115.    Plaintiffs and members of the Class seek all monetary and non-monetary relief allowed by law, including, per class member, actual damages or statutory damages of $50 (whichever is greater), treble damages, attorney's fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seeks a judgment against Defendants, as follows:

A.    For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Class and the undersigned lead-counsel as Class Counsel to represent the Class;

B.    For an order declaring that Defendants' conduct violates the statute referenced herein;

C.    For an order finding in favor of Plaintiffs and the Class on all causes of action asserted herein;

D.    For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

E.    For prejudgment interest on all amounts awarded;

F.    For an order of restitution and all other forms of equitable monetary relief; and

G.    For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury on all causes of action and issues so triable.

Dated: December 6, 2021                    Respectfully submitted,

By: _s/   Daniel Lust_____
Daniel Lust, Esq.
**GERAGOS & GERAGOS, APC**
256 5th Avenue – 4th Floor
New York, New York 10010
Telephone: (213) 625-3900
Facsimile: (213) 232-3255
Lust@Geragos.com

MICHAEL LOUIS KELLY (*pro hac vice forthcoming*)
JOSHUA A. FIELDS (*pro hac vice forthcoming*)
CONNOR M. KAREN (*pro hac vice forthcoming*)
**KIRTLAND & PACKARD LLP**
1638 South Pacific Coast Highway
Redondo Beach, CA 90277
Telephone: (310) 536-1000
Facsimile: (310) 536-1001

*Counsel for Plaintiffs on behalf of themselves and all others similarly situated*