UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
DAVID RAUS, YESSICA NAVARRO,
MOYA FERENCHAK, KATIE BINDER,
and RACHEL LEWIS, on behalf of themselves
and all others similarly situated,

    Case No.:1:21-cv-10431-VSB

                     Plaintiffs,

    **FIRST AMENDED CLASS**
    **ACTION COMPLAINT**

       -against-

    **DEMAND FOR JURY TRIAL**

ELEMENTS PRODUCTION, LLC, a New York
Limited Liability Company, BangOn!NYC,
TESTED CONTAINED RETREATS,
LLC, a Delaware Limited Liability Company, and
DOES 1 through 50, inclusive,

                  Defendants.
-------------------------------------------------------------------X

      Plaintiffs David Raus, Yessica Navarro, Moya Ferenchak, Katie Binder, and Rachel Lewis,

(collectively, "Plaintiffs"), bring this action on behalf of themselves, and all others similarly

situated, and file this Class Action Complaint against defendants Elements Production, LLC

("Elements Production"), BangOn!NYC, Tested Contained Retreats, LLC ("Tested Retreats,"

referred to collectively herein with Elements Production and BangOn!NYC as "Defendants") and

DOES 1 through 50, inclusive.  Plaintiffs allege the following based on information and belief, the

investigation of counsel, review of public documents, and personal knowledge as to the allegations

pertaining to themselves.

## INTRODUCTION

    1.    This class action lawsuit seeks redress for Defendants' knowing failure to properly

organize, prepare, and provide ticket purchasers and attendees of the Elements Festival 2021 with

the experience the Defendants extensively promoted and marketed as being a safe, packaged, multi-

day camping and music festival to take place on September 3-6, 2021 in Lakewood, Pennsylvania ("Elements Festival"), featuring, among other things, three full days of specified musical acts, substantial COVID-19 safety protocols, such as a CrowdPass mobile service application ("CrowdPass App") for health screening, Americans With Disabilities Act ("ADA") accessible facilities and experiences, premium, group, and standard camping lodging, where attendees could camp for several nights and enjoy a number of musical acts throughout the festival dates, as well as VIP viewing stages and premium parking passes close to the festival entry for those interested in paying additional money to purchase them.

2.       After its conclusion on September 6, 2021, the Elements Festival quickly achieved media notoriety because attendees had arrived to attend and were greeted with rain-soaked grounds (the Hurricane Ida storm had recently passed through), completely disorganized and disheveled parking areas, insufficient staffing, over ten hours plus waits just to enter into the festival itself (thereby forcing many attendees to miss the Elements Festival's first day of musical acts and experiences despite paying for them), lack of proper COVID-19 screening and neglect of the CrowdPass App marketed for that purpose, and a scarcity of access to food, water and sanitary toilets at times, among other issues. Defendants had essentially ignored Hurricane Ida's arrival in the area, did not provide adequate staffing for the musical festival, did not properly screen attendees for COVID-19, had insufficient food and water supplies, the lodging was not as advertised, and all of this combined with the lack of basic amenities for attendees created an uncomfortable and dangerous situation. Festival-goers were subjected to extremely long, time-consuming walks in mud-soaked grounds with heavy camping gear and equipment, as part of the nearly ten hour wait just to enter into the festival, during which no food, water, restrooms or guidance from anyone affiliated with Defendants was made available. Most attendees missed the

first day of musical acts they had paid to see, due to the excruciating wait and physical effort it took just to get into the festival itself. The COVID-19 protocols that had been advertised to provide safety and security for attendees, such as screening via the CrowdPass App, were also not properly utilized by Defendants, and numerous attendees' vaccination status and/or testing status, and valid identification ("ID") was not checked at all upon entry, putting the health of everyone attending at risk. Once inside, attendees were subjected to extremely unsanitary conditions, unusable handwashing stations, and bathing stations many had paid for such as showers that did not even work. Furthering the misery, Elements Festival security allowed attendees to bring in only one liter of water, but then the festival ran out of its own water provisions by the second day, and access to water thereafter was spotty, putting attendees at risk for dehydration, additional health risks, and more.

3.      Due to the lack of planning, proper health and safety related preparations, poor sanitation, and complete disorganization in terms of the Elements Festival's parking and other aspects of the festival, and based on the up to ten hour plus wait to get into the Elements Festival they had experienced two days earlier, many attendees such as Plaintiffs realized that, due to the disorganized and understaffed parking situation, it would be necessary to leave early in the morning on the third day, and miss the specified musical acts they had paid to see on the third day, in order to escape the unsafe and unsanitary conditions at the Elements Festival. Even then, attendees' efforts to escape the understaffed, disorganized, and unsanitary festival were hamstrung by the disorganized parking and the mud-soaked grounds, where no efforts had been made by Elements Festivals' staff or security to make certain parking areas more accessible, and easier to use, such as putting down wood chips to facilitate vehicle access and then drive those vehicles out of the area. Further, none of the festival staff was available to assist attendees seeking to depart on the

Elements Festival's third day, when their vehicles did get stuck in the mud, and attendees were thus forced to seek the help of a local family in order to escape.  The local family appeared to provide assistance in this circumstance due to their concern for the safety of attendees and the dangerous parking situation that had arisen.

4.     Ticket packages ranged in cost from approximately $350 up to $1,300, which could include, among other things, according to Elements Festival's marketing and advertising, VIP tickets, including expedited check-in, a special raised stage viewing platform, a VIP tea house lounge, free massages, premium liquor bar access, a VIP concierge, along with VIP Parking Passes, none of which was actually provided to VIP ticket purchasers. Upon information and belief, Defendants sold thousands of ticket packages to the Elements Festival in total, and the event was ultimately oversold.

5.     Attendees suffered financial damages associated with the purchase of the tickets and/or other expenditures associated with the Elements Festival depending on the ticket packages purchased and their travel arrangements, including their attempts to return home safely and expeditiously after the horrendous experience they encountered there. Not only did ticketholders and attendees shell out hundreds and/or thousands of dollars to purchase tickets to the event, but in order to attend the event, they were required to make transportation arrangements to and from Lakewood, Pennsylvania. Defendants failed to warn attendees about the issues awaiting them at the festival grounds, such as, without limitation, the long and physically arduous walks and waits for entry, lack of health and safety protocols, including lack of health and safety protocols related to the COVID-19 pandemic, and inadequate access to water and food supplies, and completely disorganized conditions at the festival.

6.     Outrage spread quickly on social media and news outlets, with the websites

www.vulture.com and www.edmtunes.com, among others, describing the events as reminiscent of the disastrous Fyre Festival fraud and scandal, which had unfolded years earlier in April and May 2017.

7.     Plaintiffs bring this class action on behalf of all ticket buyers and/or festival attendees wronged by Defendants, and seek damages in excess of $5,000,000 on behalf of themselves and the Class.

## **PARTIES**

8.     Plaintiff David Raus ("Mr. Raus") is, and, at all times relevant to action was, a resident of Wake Forest, North Carolina, and a citizen of the State of North Carolina.

9.     Plaintiff Yessica Navarro ("Ms. Navarro") is, and, at all times relevant to action was, a resident of Wake Forest, North Carolina, and a citizen of the State of North Carolina.

10.    Plaintiff Moya Ferenchak ("Ms. Ferenchak") is, and, at all times relevant to action was, a resident of Philadelphia, Pennsylvania and a citizen of the State of Pennsylvania.

11.    Plaintiff Katie Binder is, and at all times relevant to this action was, a resident of Minneapolis, Minnesota and a citizen of the State of Minnesota.

12.    Plaintiff Rachel Lewis is, and at all times relevant to this action was, a resident of Austin, Texas and a citizen of the State of Texas.

13.    Upon information and belief, defendant Elements Production, LLC is, and, at all times relevant to this action was, a New York Limited Liability Company.

14.    Upon information and belief, Defendant BangOn!NYC, an unincorporated business headquartered in New York City with its principal place of business in New York.

15.    Upon information and belief, Defendant Tested Contained Retreats, LLC is, and, at all times relevant to this action was, a Delaware Limited Liability Company.

16.     The true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants sued herein as DOES 1 through 50, inclusive, are currently unknown to Plaintiffs, who therefore sue Defendants by such fictitious names. Plaintiffs are informed and believe, and thereon allege, that each of the Defendants designated herein as DOES is legally responsible in some manner for the events and happenings referred to herein and caused injury and damage proximately thereby to Plaintiffs as hereinafter alleged. Plaintiffs will seek leave of court to amend this Complaint to reflect the true names and capacities of the Defendants designated hereinafter as DOES when the same have been fully ascertained.

## JURISDICTION AND VENUE

17.     The Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) because there are more than 100 Class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendants.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because at least one Defendant maintains its principal place of business in this District, and a substantial part of the events giving rise to Plaintiffs' claims took place within this judicial district, including Defendants' marketing and sale of the tickets and other items from this District.

## FACTUAL BACKGROUND

### The Marketing and Advertising of Elements Festival

19.     Scheduled to take place over the labor day holiday weekend (September 3-6, 2021), the Defendants marketed and advertised Elements Festival as a three day high end camping, arts and music festival. According to Elements Festival's website, attendees at the Elements Festival could purchase tickets including general admission camping, preset camping, or premium camping,

which for additional money only could be accessed by attendees with premium camping passes and included access to premium restrooms, with flushing toilets, and premium showers. The three full days of musical acts were advertised to include performers such as Diplo, Ganja White Night, Bob Moses, Esseks, Dessert Dwellers, J. Worra, Oona Ogal, and others, with main stage live music acts advertised from 1:00 p.m. to 11:00 p.m. every day of the festival, starting on Friday September 3, 2021 and ending Sunday September 5, 2021. The Elements Festival website also advertised that Elements Festival would be an ADA accessible event to accommodate attendees with disabilities.

20.    The Defendants advertised that attendees could arrive to the festival on Thursday September 2, 2021, if they purchased Early Arrival Passes. Attendees without such passes could arrive Friday September 3, 2021 between 10 a.m. and midnight, or Saturday September 4, 2021 between 10 a.m. and midnight. No attendees were allowed in after those time periods, and attendees were required to be off festival grounds by noon on Monday September 6, 2021.

21.    In terms of parking for the festival, the Defendants specified on the festival website that General Admission parking was available fifteen to twenty minutes from the festival grounds by shuttle ride. Attendees could purchase a pass for Silver Parking, a five minute walk from festival grounds (changed by the Defendants three weeks before the festival, after many attendees had already made purchases, to a five minute shuttle ride to the festival), or a pass for Gold Parking, a short one minute shuttle ride from festival grounds. The Defendants also specified on the website for the festival that box trucks trailing the parking shuttles would be available for attendees to safely put their belongings in, to make everything easier for attendees in terms of parking and getting into the festival from their vehicles.

22.    The Defendants also marketed and advertised numerous amenities available to festival attendees, such as, without limitation, a General Store, which would have basic

convenience items available for purchase, free water stations for attendees, plenty of food vendors on-site, and activities such as a lake to swim in. The Defendants' policies also limited attendees to bringing in no more than one liter of water into the festival.  Further, Defendants marketed and advertised the music and camping festival as being on a lakefront property containing a sparkling blue lake that attendees could swim in during the festival.

23.     For COVID-19 safety protocols, the Elements Festival website indicated that the festival was "Keeping You Safe," as entry into the festival grounds required full vaccination or proof of a negative PCR lab test within 72 hours of the event, which the website indicated attendees would be required to submit via the CrowdPass App. On information and belief, the Elements Production retained Tested Retreats to organize, plan, and provide the COVID-19 safety protocols listed on the Elements Festival website, among other aspects of the festival, as the means to keep attendees safe from COVID-19 throughout the festival.  The Elements Festival website indicated that all attendees were required to bring a valid ID in order to access the festival grounds. According to the website, attendees were not allowed reentry into Elements Festival due to the current circumstance around Covid-19, the festival's testing procedures, and state protocols related thereto.

## The Elements Festival's Failures

24.     Upon arriving at the Elements Festival, Plaintiffs and attendees were shocked to learn that the experience promised by the Defendants fell immensely below the advertised expectations.  From the beginning, the Elements Festival did not provide anything close to the experience the Defendants had set forth on their website and other marketing materials.

25.     As reported on social media and online news sources in its aftermath, the Elements Festival was a completely disorganized mess, and did not offer the experience the

Defendants had promised, which became apparent immediately upon the attendees' arrival.

26.    Many attendees had planned for and targeted an arrival in the festival area throughout the morning of Friday September 3, 2021, in order to enter the festival at or close to the 1:00 p.m. arrival time on that date the Defendants had advertised for attendees without Early Arrival Passes.  However, upon arrival in the area, due to the complete disorganization, lack of coordination, lack of staffing for parking issues, and poor, muddy conditions at the parking sites, many attendees waited for hours, for some up to ten hours and more, just to enter the festival.  In addition, many attendees were forced to walk miles, with heavy items including camping gear and equipment, because the alleged shuttle ride system the Defendants had advertised was not functioning properly at all.  In addition, no food, water, or restrooms were made available to attendees dealing with the parking line waits.  Additionally, attendees who had incurred additional expense to obtain Silver Parking Passes and Gold Parking Passes, were denied the benefits of such passes as access to the advertised Silver and Gold parking areas was completely insufficient.   Thus, many attendees, including without limitation, disabled attendees who had been led to believe the festival had ADA accessible facilities, were forced to incur substantial hardship just to enter the festival, and subjected to waits of up to more than ten hours after they arrived in the area. Due to Defendants' failures which caused the delays, many attendees were forced to miss most if not all of the live musical acts they had paid to see on the festival's first advertised day for musical performances.

27.    Certain attendees had also purchased more expensive VIP tickets to the Elements Festival, which the Defendants had advertised as including expedited entry to the festival, among other things.  However, even attendees who had purchased the VIP tickets supposedly including expedited VIP entry were forced to wait for more than ten hours just like the rest of the festival's

attendees, only to be told at the festival entrance that they needed to wait in another line reserved

for attendees with VIP tickets.    Neither festival staff nor security was available to inform

attendees waiting in the entry lines that there was a separate VIP ticket entry line, and no signage

was apparent that would otherwise direct attendees with VIP tickets to a separate line from

general admission.

28.    After enduring the hardships caused by the disorganization and chaos related to

arrival and parking for the festival, attendees who expected a safe experience based on the

Defendants' advertising of the safety protocols that allegedly would be in place related to the

COVID-19 pandemic were shocked and dismayed when they realized no such safety protocols

were being properly enforced at all.  While the festival's website had informed attendees they

would all be required to submit proof of either (a) full vaccination as defined by the Center for

Disease Control ("CDC") or (b) a negative polymerase chain reaction ("PCR") test result taken

within seventy-two hours prior to the festival, via the CrowdPass App, many attendees did not

have the CrowdPass App even checked by staff at Elements Festival, and no one at the festival

was actually checking attendee IDs  to determine whether an actual vaccination status or test

result was being provided by the actual attendees seeking entry.  Thus, there was a consistent

failure to verify that any status or results shown, if attendees were even asked to do so, was

verified.  On information and belief, Elements Production retained Tested Retreats to provide the

advertised safety protocols for the festival, including the advertised safety protocols related to

COVID-19 screening, but Tested Retreats failed to actually provide any alleged safety protocols

properly, creating great concern on the part of Plaintiffs and other attendees, and putting all

attendees at risk of preventable exposure.

29.    Once through the entry from parking into the festival, many attendees, who had

missed part of or all of the first day's musical acts due to the extensive wait time just to get from the festival's parking areas into the festival itself,  and were exhausted due to the parking area issues they had encountered, were subjected to further extremely difficult conditions, for a number of reasons.  Attendees had been limited to bringing one liter of sealed bottled water into the festival, but the festival ran out of water to sell to attendees on Saturday, and it was replaced only intermittently with limited access, and in conjunction with the extremely long concession lines throughout the festival, attendees were subjected to thirst, dehydration, and potential resulting illnesses.  The lines for any type of food and refreshments were excessive, and it could take attendees times exceeding an hour just to attempt to obtain access to food and water at the festival. It appeared to attendees there was limited staffing to address this issue. The General Store, which the Defendants had advertised would have basic convenience items for sale, was not readily apparent to attendees, who were often forced to wait in line at various vendor stands for extensive periods to simply get basic supplies such as water.  Sanitation was also extremely poor throughout the grounds, and apparently due to understaffing, urine and feces filled up bathrooms throughout the festival grounds, and washing stations were rarely stocked with any soap products and appeared to never be cleaned during the festival.  This greatly exacerbated health concerns of attendees who had already experienced the lack of advertised COVID-19 protocols at the festival's entry, due to the failures of Defendants.

30.     Attendees who had paid for specific categories of camping types quickly discovered they had not been sold what the Defendants had advertised.   For example, attendees who had purchased "Group Camping," which was advertised to provide roped off, reserved areas for groups that met a minimum number of attendees and paid an extra $5 fee per attendee in the group, with a dedicated on-site manager assigned, quickly learned their group locations were neither roped off

nor reserved exclusively for the group at all and there also was no dedicated on-site manager. Attendees who had purchased "Premium Camping," which was advertised to be an exclusive, separate area from general admission camping and to require a specific wristband for entry into, quickly learned there was insufficient security checking wristbands so the area was not exclusive to attendees who had paid for premium camping at all. In addition, while premium camping was advertised to include indoor showers and indoor restrooms, the showers and restrooms were really just porto-shower and porto-pottie type facilities (which other festivals such as Electric Daisy Carnival would more accurately advertise as Air-Conditioned controlled portable trailers).

31.    The conditions at the Elements Festival were far from the only issue. A number of the musical acts the Defendants had advertised would perform at the festival, and which many attendees had paid to see, such as Esseks, Dessert Dwellers, J. Worra, Oona Ogal, and others, pulled out of the festival and did not even perform there at all. Furthermore, certain attendees had purchased more expensive VIP tickets, which the Defendants had advertised as including access to special viewing areas close to the musical acts. However, for attendees who had purchased the VIP tickets, there was only one festival performance stage out of the numerous stages where security was actually checking that attendees in the special access area had purchased VIP tickets and were thus allowed to be in the area. Thus, attendees who paid extra money for VIP tickets which had been advertised as entitling them to access the VIP viewing areas for the stages once inside the festival, did not get what was advertised to them at all.

32.    Further, the sparking blue lake Defendants had advertised for swimming and other water activities during the festival was not truly accessible by festival attendees, as Defendants had failed to hire staff and lifeguards sufficient to allow attendees to have access to swim in the large body of water on the property. In fact, attendees only had access to a small area of knee-deep water

that they were allowed to wade in. Even more troublingly, festival staff members available to address attendees' concerns about festival issues were difficult to find. The Elements Festival appeared grossly understaffed and on information and belief, was way oversold in terms of the number of attendees initially expected and those who ultimately attended. Furthermore, while the Defendants had advertised Elements Festival as having ADA accessible facilities and experiences, staff at the ADA site on the festival grounds was not responsive to disability-related issues when disabled attendees brought such issues to their attention.

33.    Based on the issues they had encountered upon arrival at Elements Festival, and the many hours long wait they had endured just to get inside the festival through the entrance from the parking areas, and concerns regarding lack of proper COVID-19 screening, many attendees departed the festival early, in order to avoid being stuck in long lines awaiting departure from the parking areas, and to return home, and many missed most if not of the specified musical acts on the festival's third day as a result.

34.    Plaintiffs and other Class members sustained damages as a direct and proximate result of Defendants' negligence and other wrongful conduct and omissions in connection with the sale of tickets to and other items associated with the Elements Festival, and promotion and organization of the Elements Festival.

## Plaintiffs' Experience

35.    Plaintiffs and other Class members relied on the Defendants' misrepresentations and omissions regarding the experience and accommodations. Plaintiffs and the Class (as defined below) have been damaged by Defendants' deceptive, negligent, and unfair conduct and wrongful inaction in that they purchased tickets for, and other items associated with, the Elements Festival, that they would not have otherwise purchased, had the Defendants not misrepresented the

experience of attending the Elements Festival or warned them of the potential harms caused by attending the event.

36.     Plaintiff Yessica Navarro, along with her fiancé David Raus, who at all relevant times lived in Wake Forest, North Carolina, have attended a number of music festivals during the last several years, and consistently looked for new and interesting music festivals to attend during that time. More than a year before Elements Festival 2021 was even set to take place, Ms. Navarro began following the Elements Festival's Instagram account, at the Instagram handle @elements_festival_, in order to learn more about the festival and what it offered. After Ms. Navarro spent extensive time and effort researching Elements Festival online at the festival website, www.elementsfest.us, and on the Instagram account, Ms. Navarro and Mr. Raus decided, based on the Defendants' representations, to purchase VIP tickets to attend the festival, which had been advertised to include, among other things, expedited VIP entry and special access to viewing areas for the festival's music acts.  Ms. Navarro and Mr. Raus also purchased a premium camping package for the festival which the Defendants advertised to include, among other things, a wristband which provided exclusive access to the premium camping area, and indoor showers and indoor bathrooms, all advertised to be separate and apart from the festival's General Admission camping areas and attendees. Ms. Navarro and Mr. Raus paid $1,269.90, in total, for the tickets and parking and camping passes for the festival.

37.     As the date of the festival approached, Ms. Navarro and Mr. Raus made plans to travel to Lakewood, Pennsylvania, where the festival was to take place, from their home in Wake Forest, North Carolina. Although Ms. Navarro and Mr. Raus had purchased parking passes for the Silver Parking area, which the Defendants had advertised was located within a five-minute walk of the festival entry, they received an email from Elements Production approximately three weeks

before the festival was scheduled to start, indicating the Silver Parking area would instead actually be a five-minute shuttle ride from the festival's entry location. As they traveled to Lakewood from Wake Forest, Ms. Navarro and Mr. Raus were particularly excited to see a number of the musical acts the Defendants had advertised would be performing, including acts such as Chris Lake, Bonobo, Yotto, Walker & Royse, Diplo, LP Giobbi, and Claude Vonstroke, among others.

38.    After making the long drive from North Carolina to Lakewood, Pennsylvania to attend the festival, Ms. Navarro and Mr. Raus were shocked upon their arrival at the festival area at 10:15 a.m. on September 3 to learn of the completely disorganized, inefficient, and troubling parking situation that had arisen. Specifically, when Ms. Navarro and Mr. Raus arrived in their vehicle to park, no festival staff was available to help them, and there were no signs directing them to the proper location for them to park their vehicle.  Thus, upon arrival, with no direction from anyone associated with the festival, and no signs providing any guidance whatsoever, Ms. Navarro and Mr. Raus were left with no choice but to follow a long line of cars waiting to get to the festival parking.  Amazingly, Mr. Raus was even forced to direct traffic at times, in order to attempt to provide assistance to the parking disaster unfolding, because Defendants provided no such direction or guidance.  One Ms. Navarro and Mr. Raus made it to a parking lot, which was not the Silver Parking area they had paid for, after a nearly seven-hour wait in the vehicle line, they encountered festival staff for the first time there, who told them to park at that area, and that they must carry their own gear and equipment about a half mile through muddy conditions in order to get to the actual Silver Parking area. This instruction from festival staff was extremely frustrating for Ms. Navarro and Mr. Raus, who had already made the long drive to the area before encountering the excessive wait due to the parking conditions Defendants created, and despite their own efforts, they did not arrive to the Silver Parking area they were supposed to have access to until approximately

5:30 p.m.  After Ms. Navarro and Mr. Raus were forced to carry all their camping gear and other belongings from their car, and walk in mud down a road for at least half a mile to the actual Silver Parking area, they encountered a fellow festival attendee there who had a microphone and was telling all attendees waiting in that area to get in line in order to enter the festival via a shuttle bus ride.  At that location, Ms. Navarro and Mr. Raus were then forced to wait in line for nearly three more hours just to get to the front of the line in order to get a shuttle bus to the festival entry. However, when they arrived at the front of the line at the Silver Parking area in order to get on a shuttle bus, after waiting nearly three hours, only then did a festival staff member inform them that, since they had paid extra money for VIP tickets, that they should get out of that line as another staff member handling VIP ticketholders would assist them.

39.    Shortly thereafter, a festival staff member walking through the crowd of attendees toward the front of the attendee line that had accumulated in the Silver Parking area told Ms. Navarro and Mr. Raus that they should proceed to a table for VIP ticketholders. After Ms. Navarro and Mr. Raus followed that direction, only then, after an excruciating wait of more than nine hours since they had arrived in the festival area to attempt to park, did Ms. Navarro and Mr. Raus finally have their bags checked, and they were provided with wristbands for festival entry, and provided access to the shuttle bus which ultimately dropped them at the festival entry.  During the entire more than nine and a half hour wait Ms. Navarro and Mr. Raus endured, no adequate guidance from any festival staff was provided to them, and no food, water or restrooms was made available to them either. The festival staff Ms. Navarro and Mr. Raus did encounter was rude and even shouted profanities at them during this part of the ordeal.

40.    As they finally went through the screening for entry to the festival, prior to getting on the shuttle bus that would drop them at the entry, Ms. Navarro and Mr. Raus were shocked to

learn that the safety protocols the Defendants had advertised for COVID-19 related issues were really not being enforced. While Ms. Navarro and Mr. Raus understood from the Defendants' advertising that vaccination verification documents or testing results for attendees would be demonstrated to festival security through the CrowdPass App on attendees' mobile phones, and the QR Code contained therein, it did not appear to Ms. Navarro and Mr. Raus that the QR Codes on attendees' phones were actually being scanned by Elements Festival's staff members at all.  Even where the CrowdPass App was checked by staff, it did not appear that any steps were taken by staff to determine that the person listed in the CrowdPass App on the mobile phone shown was actually the person listed therein, through cross-checking a valid ID.  While the Defendants had advertised the CrowdPass App as a useful and efficient method to scan attendees for COVID-19 safety purposes, if the QR Code in the CrowdPass App was not being checked or the ID of the person showing the QR Code was not being checked, the staff, including Tested Retreats, which on information and belief was retained by the Defendants for that purpose, among others, was not doing their job to protect the safety of attendees.  Neither Ms. Navarro nor Mr. Raus was asked to show ID upon entry to the festival, which the Defendants had advertised would be required for entry, and which greatly raised their concerns about a complete lack of proper COVID-19 safety protocols at the festival and the dangers of attending it, upon their arrival there.

41.     Due to the delays caused by Defendants, Ms. Navarro and Mr. Raus were not able to enter the festival until after 9:00 p.m. on Friday September 3, 2021, and needed to set up their campsite at that time, and thus missed all of the musical acts who performed on that date and whom Ms. Navarro and Mr. Raus had purchased tickets to see perform. In particular, Ms. Navarro and Mr. Raus wanted to watch Walker & Royse perform during the schedule of acts set for Friday September 3.

42.     Inside the festival, Ms. Navarro and Mr. Raus learned that the premium camping Defendants had advertised as separate and apart from General Admission attendees, with exclusive wristband access, was not truly exclusive as advertised.  There was nothing separating General Admission attendees from accessing the premium camping area Ms. Navarro and Mr. Raus were provided, other than a single staff member at one such area for an improperly limited period of time, and no festival staff checking were adequately checking wristbands for this purpose. Exhausted from the parking area ordeal, and frustrated due to being forced to miss the entire first day of musical acts as a result of Defendants' failures, Ms. Navarro and Mr.  Raus worked set up camp as best they could in the pitch black darkness due to the time of night of their arrival at the campsite, and went to sleep as soon as possible there.

43.     By Saturday, September 4, the Elements Festival's unsanitary conditions and lack of proper staffing to handle the issue were completely apparent to Ms. Navarro and Mr. Raus. While the Defendants had advertised indoor showers and indoor restrooms available to attendees who purchased premium camping packages, such as Ms. Navarro and Mr. Raus, these facilities were essentially porto-showers and porto-potties, and by 3:00 p.m. Saturday the showers at the premium camping site did not work. Further, the problem was exacerbated because there were only five restrooms for the more than one thousand people that appeared to have access to the premium camping area.  The limited number of porto-potties that were available to attendees in the premium camping area were already filthy by Saturday morning, and Ms. Navarro and Mr. Raus witnessed no staff assigned to do any cleaning or sanitation on the porto-showers and porto-potties Defendants made available to them in this area. The problematic sanitation issues continued throughout the remainder of the time Ms. Navarro and Mr. Raus spent at the festival.

44.     Ms. Navarro and Mr. Raus also experienced significant delays during their time

inside the festival on its second day, by being forced to wait in long lines simply to get basic supplies such as water, which the festival ran out of for a time on Saturday.  Mr. Raus specifically waited in line for an hour just to get water on Saturday September 4.  It appeared to Ms. Navarro and Mr. Raus this was due to insufficient staffing and Defendants' failure to obtain sufficient supplies. Furthermore, Ms. Navarro and Mr. Raus were never made aware of any General Store at the festival, as Defendants had advertised, and to the best of their knowledge, the advertised General Store for the festival never came to fruition.  Put simply, basic amenities such as water were not readily and consistently available to Ms. Navarro and Mr. Raus while inside the festival, due to Defendants' failures to make such supplies readily accessible for attendees.

45.    By early Sunday morning, Ms. Navarro and Mr. Raus, who had originally planned to depart the festival at its completion on Monday September 6, 2021, felt forced to attempt to depart early Sunday due to all of the issues with the festival, and based on concerns created by the parking issues on their arrival, that they simply would not be able to leave at all if they attempted to leave Monday with the rest of the attendees once the festival concluded.  Ms. Navarro and Mr. Raus also continued to be extremely concerned about their health and safety due to the lack of proper COVID-19 screening protocols for festival entry.  Rumors had been circulating among attendees that another seven hour or more wait would be part of any attempted departure on Monday, and even festival staff told Ms. Navarro and Mr. Raus that could be the case, so they were left with no choice but to depart early in order to attempt to escape the festival grounds. Nonetheless, even on Sunday morning, it still took Ms. Navarro and Mr. Raus over three hours to depart the festival grounds, and their departure included trekking long distances through a mud-filled parking lot witnessing numerous vehicles of other attendees stuck in the mud and needing towing services from a local family, who was willing to provide such services to attendees

experiencing difficulties, because neither the festival nor its staff provided any such assistance. Due to the early departure Ms. Navarro and Mr. Raus were forced into, they missed several musical acts they specifically purchased tickets to see, who performed on Sunday September 5, such as Diplo, LP Giobbi, and Claude Vonstroke.

46.    After their departure, on the morning of Sunday September 5, 2021, Ms. Navarro and Mr. Raus were completely exhausted from the difficult and horrible experience they had encountered at Elements Festival.  Although they wanted to return to their home in Wake Forest, North Carolina, as soon as possible, they were exhausted and were left with no choice, due to safety concerns resulting from fatigued driving, but to stop and get a hotel room in Harrisburg, Pennsylvania, to recover, rather than driving such a long distance through exhaustion.  They incurred additional unanticipated expenses as a result.

47.    Shortly after returning home, Ms. Navarro and Mr. Raus wrote Elements Production an email requesting a full refund of all the parking ticket, entrance ticket, and camping ticket expenses they incurred as a result of attending Elements Festival.  After several weeks, they received a response to this email wherein Elements Production indicated it would provide a refund to Ms. Navarro and Mr. Raus for the Silver Parking passes only, but no refunds for any other expenses they incurred.  To date, Ms. Navarro and Mr. Raus have not received any refund, even the partial refund for parking Elements Production indicated would be provided.

48.    Plaintiff Moya Ferenchak, who at all relevant times lived in Philadelphia, Pennsylvania, has attended a number of music festivals during the last several years, and after learning of the musical acts set to perform at Elements Festival, and the camping and other experiences the Defendants advertised to provide, was excited to attend the festival along with her partner and a number of other people. Ms. Ferenchak purchased a General Admission ticket bundle,

for Group Camping, and a general parking pass. Ms. Ferenchak paid approximately $380 for her ticket, and parking and camping passes.

49.     Ms. Ferenchak arrived in her car in the area of the festival at around 1:00 p.m. on September 3, 2021, along with her partner, and the disorganization and disarray of the parking situation was immediately apparent to Ms. Ferenchak, who was upset and dismayed by the situation. Specifically, after arriving in the area of the festival on September 3 in her car, Ms. Ferenchak waited along with her partner in a long line of cars, barely moving at all, with no apparent end in sight. There was also insufficient festival staff available to help them, and no signage which could serve as a guide to the proper parking area, even if the rest of the cars attempting to park were moving, which they barely were.  The line of cars Ms. Ferenchak and her partner encountered turned out to be about four and a half miles long, and moved extremely slowly the entire time they were in it, and this was just to be able to park their car. Once Mr. Ferenchak and her partner were actually able to park their car, after a long and exhausting wait, they were forced to wait in a long line of other attendees, for several hours, only to be told when they reached its end that shuttle buses to take them to the festival were not coming to that location at all.

50.     Ms. Ferenchak, who has severe rheumatoid arthritis, and several other autoimmune conditions, and is thus disabled, had purchased tickets to Elements Festival, in part based on the Defendants' representations that the event would provide ADA accessible facilities and experiences. During the long, multi-hour wait in line, after she exited her car to attempt to get on a shuttle bus to get to the festival entry, Ms. Ferenchak had an extremely difficult and painful time waiting, especially with no food, water, or bathrooms made available to attendees such as her during that extremely long waiting period, which had followed the lengthy wait in line in the car.  Due to the length of the walk, through mud-soaked grounds, and in part due to her disability, Ms.

Ferenchak was in severe pain during the walk to the new shuttle bus area.

51.    After several long and painful hours waiting to get on a shuttle bus to take her and her partner to the festival entry, only then did festival staff first inform Ms. Ferenchak and her partner that the shuttle business were actually not coming to that parking area, but instead they were required to make an approximately mile long walk to another parking area in order to get on a shuttle bus to the festival entry.  Once in the area where the shuttle buses were actually taking attendees to the festival entry, after enduring many hours of waiting and physical hardship, due in part to her disability and the obvious fact the parking at Elements Festival was not ADA accessible, Ms. Ferenchak was shocked and dismayed when she realized the COVID-19 safety protocols the Defendants had advertised would be required for festival entry were not actually being implemented at all.   The CrowdPass App for Ms. Ferenchak and her partner were not even checked by festival staff or security, and it appeared to them that most attendees seeking to get on the shuttle buses to the festival did not have their CrowdPass App checked either. Where Ms. Ferenchak did witness an attempt by staff associated with the festival to check on the CrowdPass App, it appeared to her the scanners were not even working, and sometimes festival staff appeared to just eyeball the CrowdPass App on an attendee's phone screen, without truly checking.  Tested Retreats, which Plaintiffs are informed and believe was hired to, among other things, provide COVID-19 screening for Elements Festival attendees, did not appear to be doing proper screening work at all.

52.    Prior to boarding the shuttle bus to travel to the festival entry, Ms. Ferenchak was asked by festival staff to put her camping gear and other belongings in a U-Haul truck that she was told would carry them to the festival entry. When she went to retrieve her gear and belongings at actual the festival entry, however, it appeared they had simply been dumped on the ground by festival staff and one of her shoes that she had included with her belongings in the U-Haul was lost

and never found thereafter.

  53. By the time Ms. Ferenchak and her partner were actually able to enter the festival, it was sometime around 10:00 p.m. on the night of September 3, approximately nine hours after they had arrived in the festival area to park, and her body was in so much pain she could barely walk, let alone carry her camping gear and belongings. Her shock and dismay at the situation she had encountered was furthered when she learning the Group Camping she had purchased from the Defendants, was not as advertised at all.

  54. Specifically, the Group Camping, which had been advertised to provide roped off, reserved areas for groups that met a minimum number of attendees and paid an extra $5 fee per attendee in the group, with a dedicated on-site manager assigned, provided no such thing. Instead, Ms. Ferenchak quickly learned the group camping area she and others had reserved was not roped off at all, and was not an exclusive, separate area, but could be accessed by anyone. Additionally, there was no dedicated on-site manager for Ms. Ferenchak's camping group, as the Defendants had indicated would be provided. In fact, several of Ms. Ferenchak's friends who had also purchased Group Camping as part of her group, could not even find a spot to camp in her area by the time they were finally able to enter the festival around 2:00 a.m. on September 4, and so they simply had no choice but to leave.

  55. Ms. Ferenchak felt pain and discomfort due to the difficulties she encountered on the festival's first day, and she also had serious concerns during her entire time inside the festival due to the lack of adequate COVID-19 safety protocols at entry. In addition, Ms. Ferenchak also discovered that the conditions inside by the morning of the festival's second day were unsanitary, as the limited number of porto-potties available were overflowing with urine and feces, which further distressed her and made her feel sick as well. Despite the unsanitary conditions that were

apparent to anyone, it did not appear to Ms. Ferenchak that any staff from the festival was assigned to clean them or had made any effort to clean them.

56.     Ms. Ferenchak, whose disability causes her great pain at times, and was greatly exacerbated by the long and difficult entry to the festival due to the disorganized parking issues, attempted to get help at the festival by visiting the specified ADA help center location there, due to her concerns about her anticipated departure from the festival on Sunday September 5.  While Ms. Ferenchak explained to staff at the ADA help center location her situation and specifically requested help departing from the festival, as she anticipated it would require long stretches of walking and long wait times like during entry, but the festival staff at the ADA help center was not helpful or responsive in a meaningful way.  Instead, the staff members simply told her she could text them when she wanted to depart but when she did so on Sunday there was no response.

57.     By early Sunday morning, Ms. Ferenchak, who had originally planned to depart the festival at its completion on Monday September 6, felt forced to attempt to depart early Sunday due to all of the issues with the festival, and based in part on concerns created by the disastrous parking issues she had encountered when she had arrived two days earlier. Ms. Ferenchak also heard rumors circulating among attendees that another long wait would be part of any attempted departure, so she was left with no choice but to depart early in order to attempt to escape the festival grounds, hopefully before the rest of the attendees also attempted to do so.

58.     Since the staff at the ADA help center did not respond to her text messages seeking help with her departure, Ms. Ferenchak was forced to haul her camping gear and other belongings over a mile through mud-filled grounds, which was absolutely exhausting and caused her further pain.  No festival staff provided any help to her with her departure, and no shuttle was provided to take her to her car.  Once at her car, due to the poor conditions in the parking areas, even still by

the festival's third day, Ms. Ferenchak's car got stuck in the mud and she and her partner had to pay a local family to help them get the car moving again, just to attempt to leave the festival's parking areas.  Due to the poor conditions, disorganization, lack of adequate staffing, and other issues, even though Ms. Ferenchak left the festival on Sunday morning, it still took her over three hours to depart the festival grounds. Additionally, during her departure, she witnessed numerous vehicles of other attendees also stuck in the mud and needing towing services from the local family who had helped her and her partner depart the parking area. Due to the early departure from Elements Festival that Ms. Ferenchak was forced into, she missed several musical acts she had specifically purchased tickets to see, who performed on Sunday September 5, such as Claude Vonstroke.

59.    Exhausted and in pain, as well as extremely frustrated and disappointed by the disastrous festival she had encountered, Ms. Ferenchak and her partner drive home to conclude the festival weekend.

60.    Plaintiff Katie Binder, who at all relevant times lived in Minneapolis, Minnesota, has attended a number of music festivals over the years, and first discovered Elements music festival on Instagram in February 2021.  Ms. Binder and her friend were considering traveling to attend the festival because one of their favorite artists, Ganja White Night, was scheduled to play. Ms. Binder did additional research on websites such as Facebook and Reddit, and it appeared from information on such websites that, during the prior years, festivals received praise via positive word of mouth. One aspect of the advertising for Elements Festival that attracted Ms.  Binder were the activity events advertised such as Yoga and the Cacao ceremony.  Another important aspect of the Elements Festival for Ms. Binder, as advertised on its website, was the festival's strict policy related to COVID-19 safety protocols.  As the Elements Festival website specifically stated, and Ms.

Binder read before deciding to attend, a negative COVID-19 test or full vaccination was required for attendees to be admitted into the festival, and the Elements Festival would screen attendees for this purpose. After purchasing tickets based on representations on the Elements Festival website, and its Instagram feed, Ms. Binder and her friend eventually got plane tickets and an Airbnb to stay at the night before the festival, during their travels there.

61.    On the first leg of the trip, Ms. Binder's flight was canceled while they were at the gate, waiting to depart, due to flooding at Philadelphia's airport from the recent hurricane, so she and her friend took a different flight to Baltimore instead.  Once they landed, Ms. Binder and her friend learned that their luggage was lost and did not make it on the flight. As the rental car and scheduled Airbnb was in Philadelphia, Ms. Binder and her friend did not want to leave Baltimore without their bags, even though they would lose money on the Airbnb. Fortunately, they were able to stay with Ms. Binder's cousin, who lives in Baltimore.  That night, Ms. Binder experienced significant anxiety about what was going to happen, and she wasn't sure if they would even get to the festival at all, especially considering their flight had been canceled as a result of a hurricane that had passed through the festival's location.  It didn't help that she had seen social media postings from other potential attendees, speculating about the condition of the grounds at the festival site due to the hurricane.  The next morning, the airline called Ms. Binder and her friend to tell them their bags were coming, but the bags arrived in Philadelphia instead of Baltimore.  At that point, Ms. Binder and her friend took two different trains to get their bags in Philadelphia after waiting at the airport.  They could not attempt to attend the festival without their bags, because the bags contained all of their camping supplies.

62.    Ms. Binder and her friend then got a different rental car and made the approximately four-hour drive from Philadelphia to Lakewood, Pennsylvania, which was especially grueling due

to the long travel day they had already had. After making the long trip, which included driving through the mountains, Ms. Binder and her friend finally arrived near the festival in Lakewood in their rental car.  However, when they got to what they believed was the festival area, there did not appear to be any signs for where to go or park, in order to attend.  As a result, without knowing it, due to the lack of signage, Ms. Binder and her friend drove right past the entrance to the parking grounds for the festival.  After turning around to make their way back to the entrance, Ms. Binder and her friend found themselves at the back of an extremely long line of cars.   A man who appeared to be festival staff, attempting to direct traffic in this area using a traffic direction wand, who also appeared to be wearing a vest and festival badge, told Ms. Binder and her friend something along the lines of "Sorry, but there's no room left -- you guys can't come in".

63.     At this point, Ms. Binder and her friend were exhausted from their long journey, extremely frustrated and angered by being told they could not enter the festival.  Based on being told that they would not be able to enter the festival, due to lack of space, Ms. Binder and her friend had to turn around and drive an hour away to try and find a hotel, once Ms. Binder finally had cell phone service in order to search for one.  It was difficult to find an available and affordable room in the area, and the one they did settle on appeared to be covered in black mold all over the bed and walls. After complaining, Ms. Binder and her friend were told some of the hotel rooms had been flooded by the recent hurricane. Ms. Binder and her friend were then given a different room, which was not much better as it was covered in trash and the sheets smelled like urine.  An old man was also loitering in the hallways by their door. At this point, Ms. Binder felt both terrified and extremely defeated, due to being turned away from Elements Festival after making such a long and arduous journey. All Ms. Binder could do was sit in the rental car and cry. She felt extremely panicked and stressed, more than she ever had been in her life.  Ms. Binder found herself having

extreme chest pains from the panic attacks she was having and she just wanted to go home at that point.

64.     After a sleepless night, Ms. Binder and her friend decided that they would try to go back to the Elements Festival to see if they could get finally get in, as they had purchased valid tickets but been improperly denied entry, the day before.  However, after doing some research on the internet, they realized attempting to return to enter the festival was actually a horrible idea. Ms. Binder read the comments of people on Facebook sharing their experiences at the festival. Attendees said they waited in line over sixteen hours just to get in to the festival, with no bathrooms or water. Additionally, attendees said there were apparently no camping spaces left for additional attendees at all.  Due to the chaos that had ensued at the festival entry, festival security who might have sporadically checked attendees for proof of a negative COVID-19 test or vaccine at the outset, had neglected to continue doing so, according to other attendees on Facebook.  Based on what she read, Ms. Binder believed countless festival attendees inside the festival, had not even been checked. As Ms. Binder had specifically purchased her tickets based on the Elements Festival's website representation that there would be screening for COVID-19, she felt she would be in an unsafe environment and could not attend due to the lack of camping spaces and lack of COVID-19 screening there.  Additionally, Ms. Binder read stories indicating lack of access to food and water for attendees, and describing bathrooms that were overflowing with feces everywhere.  At this juncture, based on the descriptions they read regarding the Elements Festival, and the complete lack of COVID-19 screening for attendees, Ms. Binder and her friend decided to cut their losses, avoid what sounded like an unsafe environment, and instead found a small alternative festival to go to in Aspen, New York. That festival, called Subculture, had COVID-19 screening that was enforced and adequate camping spaces for attendees who entered. They camped there for one night,

and then started the trip home the next morning. Overall, their attempt to attend Elements Festival left them extremely frustrated and angry, so they were not able to enjoy the Subculture festival as much as they otherwise might have.

65.     Ms. Binder and her friend stayed in a hotel in Philadelphia for the last night of their trip because they were so exhausted from the experience of trying, unsuccessfully, to attend Elements Festival. Shortly after arriving home from their flight, Ms. Binder contacted Elements festival by email, and requested a full refund, but to date has not received any emails or response from Elements Festival. Rather, instead of an email indicating a refund will be coming from Elements Festival, which she hoped for, she continues to receive generic, spam emails from the Elements Defendants, trying to get her to buy tickets for next year, in repeated offers Ms. Binder is definitely not interested in.

66.     Ms. Binder is twenty-one years old, and works very hard, nearly full time, to earn a modest income. She is angry and frustrated at the festival and its producers, but really just wants the Elements Defendants to do what is right.  Ms. Binder spent well over $3,000 herself on her unsuccessful attempt to attend the show with her friend, who also spent money, but was not allowed in. Since the weekend of the festivaI, Ms. Binder has reviewed social media accounts and other news stories and knows that she and her friend are not the only ones who had the extremely unpleasant experience of receiving nothing they paid for from Elements Defendants. Elements Festival completely failed to provide the experience it promised to ticket purchasers and completely failed to provide the safe environment the Elements Defendants advertised. Ms. Binder believes it is time they make it right.

67.     Plaintiff Rachel Lewis ("Ms. Lewis") is, and at all times relevant to the action was, a resident of Austin, Texas, and a citizen of the State of Texas.

68.     Plaintiff Rachel Lewis, who at all relevant times lived in Austin, Texas, has attended a number of music festivals over the years, and first heard of the Elements Festival from a friend who attended in 2018. After hearing about Elements Festival, Ms. Lewis began researching it on the internet, on platforms such as Instagram, thefestiveowl.com, YouTube videos sponsored by Elements Festival, and Elements Festival's sponsored webpage, elementsfestival.us, as she was considering attending the 2021 festival with a number of friends, and wanted to learn more about what the festival offered attendees.  During her online research, Ms. Lewis found the Elements Festival website, which described, among other things, the types of food, activities, and accommodations available to attendees, as well as specific musical acts who would be performing there, such as Griz, Walker & Royse, J.Worra, Bob Moses, and Supertask. Ms. Lewis also noticed Elements Festival's website had an entire section devoted to certain "experiences" available to festival attendees, featuring activities such as meditation, interactive art, an "American Ninja Warrior" themed obstacle course, a roller disco, a "soundbath" experience, and water activities, including in a lake at the festival site (none of which actually took place).

69.     Even though the event was being held on the other side of the country, the Elements Festival website and other advertising inspired Ms. Lewis and about three of her friends to book flights from Austin to Baltimore, Maryland, and then after arrival, planned to then caravan to rural Pennsylvania for the event in Lakewood. About a week before the festival, after a hurricane passed through the East Coast, Ms. Lewis learned of another large festival, Bonnaroo Festival, which was canceled due to the hurricane's impact.  Ms. Lewis and her friends believed Element Festival and its organizers would not push forward without a proper contingency plan, and, as they heard nothing from the Elements Festival about any cancelation, and were not

informed the festival was canceled, began their travels to the festival site.

70.     On the first day of the festival, September 3, Ms. Lewis and her group of friends made the four hour trip from Baltimore to Lakewood, Pennsylvania, by car, and arrived at the festival area around 1:00 p.m.  As they approached the festival site about a mile away from the festival entry, they came across a long line of cars at a complete standstill. It appeared to Ms. Lewis at that time that the one person associated with the festival (wearing a neon t-shirt stating "STAFF") who appeared to be attempting to assist traffic had no idea what was going on, and was not able to advise Ms. Lewis and her friends how long they would be waiting. After about three hours in line passed, at around 4:00 p.m., Ms. Lewis and her friends finally approached what resembled a parking lot but was actually a muddy field strewn with cars and confused people trying to get into the festival. After waiting for a car in front of theirs to get pushed out of a mud pit, Ms. Lewis and her friends finally got the attention of a person who appeared to be festival staff.  Ms. Lewis and her friends informed the festival staff person that they had purchased a Gold Parking pass and requested that they be pointed to the correct lot.  In response, the festival staff person told them that "The gold parking lot doesn't exist anymore", so she instructed them to just "find a spot here if you can". Extremely frustrated from the long wait in the car line, and having been told the Gold Parking they had paid extra money for did not exist, Ms. Lewis and her friends begrudgingly found a spot to park in the mud field, as they were essentially blocked into that area by parked cars anyway, at that point.  After parking, Ms. Lewis and her friends grabbed as many of their belongings as they could carry, but were forced to leave behind most of the food and water they had brought with them because they knew it was too heavy to carry so far.  Also, at that stage, they did not know how much further they would have to travel or how much longer they would have to wait to get into the festival.  They also believed

they would be able to return to their car and retrieve the food and water later, which as they later learned, was not true.

71.    Ms. Lewis and her friends then lugged their heavy belongings to the front of the parking lot to attempt to get in line for a shuttle bus that they believed would take them into the festival. Just as they arrived at the front, a person who appeared to be festival staff (based on a neon shirt stating "STAFF") announced on a megaphone that no shuttle buses would be coming to the lot they were at, but that instead, attendees would have to walk even further, down to the next lot, to be picked up by a shuttle bus. Fellow attendees in the crowd started to yell that they'd already been waiting in this line for the shuttle bus for hours, but Ms. Lewis and her friends realized, after coming this far, they had no other choice but to walk further on mud-soaked grounds with their heavy belongings just to get into the festival. Along with the mass of other festival attendees, Ms. Lewis and her friends started walking down the mud-soaked hill, dragging their suitcases, bedding, and other belongings through the mud. Ms. Lewis noticed some other attendees even started to abandon their belongings such as camping equipment in what appeared to be an effort to lighten their load due to the exhaustion of walking so far through mud. Ms. Lewis noticed one girl collapsed on the side of the road, and other attendees who had gathered to attempt to help her. She also saw a group of attendees who took turns pushing a man in a wheelchair over rocks and tree roots to attempt to get to the bottom of the mud-soaked hill. By the time Ms. Lewis and her friends made it to the bottom of the hill it was already around 5:00 p.m., and they were exhausted and still had not been able to enter the festival.

72.    To the dismay of Ms. Lewis and her friends, the next parking lot was flooded with attendees as far as the eye could see.  It appeared to Ms. Lewis at least 1,500 people were arranged in a gigantic arc, with another few hundred attendees who had hiked down the hill

behind them. The line of attendees who had accumulated in that parking lot was moving at a snail's pace, a few feet every 15 minutes or so. At that time, it appeared to Ms. Lewis that there was just one shuttle bus going back and forth to the festival entry at a time, despite the extremely large crowd of attendees that had accumulated. To Ms. Lewis, this did not seem to be a sustainable strategy for getting attendees into the festival, as it was very hot in the direct sun, and Ms. Lewis saw many people looking faint. It was also clear to Ms. Lewis that she and her friends were not the only attendees who had been forced to abandon their water due to its weight and the extensive hiking through mud-soaked grounds that was required just to get to the shuttle bus to attempt to enter the festival. Attendees were forced to share the little food they had brought with them. After another excruciating two hours in this line, at around 7:00 pm, a group of frantic looking people who appeared to be associated with the festival approached Ms. Lewis and her friends to check their tickets. A staff member informed them that they had no way to scan anything due to the lack of WiFi in the area, so the festival staff personnel, wearing a neon t-shirt saying "STAFF" just glanced at phone screens and threw out festival wristbands required for entry in a haphazard manner. No festival staff members checked the CrowdPass App to screen for COVID-19 whatsoever, which Ms. Lewis remember had been a point of emphasis on the Elements Festival website and in emails to attendees. Staff members also did not check a single bag of Ms. Lewis or any attendee in her group for security purposes.

73.     After another long wait, at approximately 8:00 p.m., news that the single school bus had gotten stuck in the mud circulated among the large group of attendees waiting. The crowd didn't move again for another hour, until about 9:00 p.m. By this point, the sun had set and attendees attempting to get into the festival were understandably getting restless, due to the conditions defendants subjected them to. At some point, the line of attendees morphed into an

angry mob, and Ms. Lewis noticed fights starting to break out between attendees, which caused her great concern. A festival staffer on a megaphone attempted to calm the crowd, but she was drowned out by frustrated attendees yelling back at her. Ms. Lewis noticed two security guards at the front of the line who wrestled with an attendee who appeared to trying to storm the shuttle bus. Ms. Lewis got separated from her group of friends in the restless crowd and started to panic. Her boyfriend was somehow able to grab her and pull her to the front of the crowd. Finally, at approximately 11:00 p.m., about ten full hours after first arriving in the festival area, and after a bumpy twenty-minute ride on the shuttle bus, Ms. Lewis and her friends finally made it to the festival entrance. Many friends of Ms. Lewis, who were about two hundred people behind her in the last line, apparently were denied entry to the festival entirely because the festival stopped running the bus at some time after she entered. Ms. Lewis was later informed that, finding themselves in the middle of nowhere with nowhere to sleep for the night, many of her friends had been forced to turn around and go home, with nothing at all to show for the wait and effort they had made to enter.

74. When Ms. Lewis got off the shuttle bus, a group of attendees were pushing their way onto a tiny box truck to retrieve their luggage, which the truck had carried in. Due to the pushing crowds, Ms. Lewis and her friends had an extremely difficult time to access the truck space and then locate their luggage. Luckily, hers was not damaged like others. By the time they were able to find their luggage and equipment, and carry it through the festival grounds to their cabin (which was extremely difficult to find since no signage was present), drop their luggage and change out of the clothes they had worn all day through the arrival process, it was already 12:30 a.m. on September 4. One aspect of the festival Ms. Lewis had immediately noticed was that there were tents everywhere throughout the festival grounds, and it did not appear that a single

square inch of the grass was not occupied by a tent. Additionally, many of the areas that had appeared to have been designated for advertised activities had been taken over by campsites and were clearly out of commission. At this point, Ms. Lewis and her friends had already missed all the scheduled musical acts for September 3, many of whom they had specifically paid for the tickets to see, except for that night's closer, Bob Moses. To her dismay, however, the stage where Bob Moses was playing was packed shoulder to shoulder, and Ms. Lewis and her friends couldn't get close enough to hear or see anything. They were exhausted after what they'd been through that day, and due to fatigue and the inability to even see or hear artists Bob Moses, Griz, Walker and Royse, SuperTask, and J.Worra perform as they had expected based on Elements Festival's promotional materials, they decided to cut their losses and go to bed.

75. Ms. Lewis and her friends woke up early on Saturday morning September 4 willing to give Elements Festival another shot, since they had traveled so far to get there. Due to the unavailability of food during the arduous trip to enter the festival the day before, they were starving. When Ms. Lewis and her friends arrived at the food court area the lines were extremely long, and it appeared the wait for food would be excessive. One man in line told Ms. Lewis and her friends that he'd been waiting an hour already at that point, and he was not even close to the front of the line. Ms. Lewis noticed that one of the food stalls already had menu items crossed out because those items were no longer available apparently, which concerned Ms. Lewis greatly since it was only the morning of the second day of the event. Ms. Lewis and her friends could not stomach the idea of waiting in another line, after the awful experience arriving the day before, so they ate protein bars she herself had brought in her suitcase instead and headed to the lake.

76. For a brief moment, that morning, Ms. Lewis felt a glimmer of hope that the experience at the Elements Festival – which had been completely awful to that point - might

actually turn around. The sun was shining, music was playing, and Ms. Lewis saw that attendees were swimming in the lake that had been advertised for swimming. Ms. Lewis and her friends went back to their campsite to change into their bathing suits, but when they returned for a swim, the lake had been evacuated. Ms. Lewis asked an Elements Festival staffer what happened, and he told her the festival had not hired enough lifeguards to watch such a large group of swimmers. Later, however, Ms. Lewis was informed through word of mouth, which at the festival that that the septic tank at the festival had exploded into the lake, and feces was strewn throughout the lake, that was now obviously unswimmable. No attendees were allowed to enter the lake the rest of the weekend, which was a huge loss for Ms. Lewis, who specifically remembered the advertisements on, *inter alia,* Instagram, Facebook, and email touting the beautiful lake and swimming that would be a part of the Elements Festival experience.

77.    Later that day, Ms. Lewis and her friends met a festival staffer who told her and her group that she was the head of parking operations. This lady's neon green t-shirt stating "Staff" indicated the same. When Ms. Lewis and her friends probed her about the disorganized mess that had transpired the day before, and caused them to miss the entire first day of the festival and corresponding musical acts, the festival staffer explained what had caused the problem, according to them.  The festival staffer explained that her and her team were advised months ago by the producers of Elements Festival that six thousand people would be attending the event, which was consistent with the representation made on the Elements Festival website.  The staffer who indicated she was head of parking explained that all of her team's parking preparations were made with that six thousand attendees number in mind. However, two days before the festival, she explained that she was told the number was closer to eight thousand, but that no additional budget was allotted to accommodate the two thousand additional attendees.  Even if additional

funds were allocated to the parking operations however, there would have been insufficient time to prepare for the additional two thousand attendees slotted to come to the festival at a later date. The head of parking operations stated her theory was that the organizers of Elements Festival had decided to reopen ticket sales after the Bonnaroo Festival was canceled in order to make extra money, albeit at the expense of safety and the experience of those attendees who had already purchased tickets to Elements Festival.

78.    Ms. Lewis' conversation with the head of parking operations made clear to Ms. Lewis what she had already believed from being there: that Elements Festival was oversold and overcrowded as a result, to the detriment of all attendees.  Ms. Lewis had not seen the dense crowds at the stages in the pictures on Element's website advertising the festival and its musical acts.  Additionally, Ms. Lewis has been to numerous festivals in the past, and actually believes eight thousand is a conservative estimate compared to what she saw at Elements. However, since tickets were not actually scanned at the festival entry, Ms. Lewis believes the festival has no way of knowing how many people actually entered.  After the conclusion of the festival, within a couple of days, Ms. Lewis researched on her own the capacity of the camp where the festival was held, Camp Lavi, which was listed as *six hundred* on Camp Lavi's official website.[1] By the end of Saturday night, it was impossible for Ms. Lewis and her friends to even find water. Strangers knocked on her cabin door to ask for water from their bathroom sink, and Ms. Lewis and her friends obliged, sympathetic with their visitor's plight and concerned about dehydration issues.

79.    On Sunday September 5, Ms. Lewis and her friends were woken up by a bunkmate who had found herself backstage with a few of the artists the night before. While her friend was backstage, she ran into one of the founders of Elements Festival, Brett Herman. When

---

[1] https://www.camplavi.com/about/facilities.

Ms. Lewis questioned him about what was going on with his festival, he mocked her and called the complaining festival attendees "pussy ass kids". Later, Ms. Lewis and her friends heard rumors that Tim Monkiewicz and Mr. Herman had been found smoking weed in a tent while the festival and experience for attendees deteriorated around them. One staffer Ms. Lewis spoke with told her that she hadn't heard from Mr. Monkiewicz or Mr. Herman since the first day.

80.    Almost all the food at the food court had run out by Sunday. The only thing Ms. Lewis and her friends were able to purchase to eat were soggy fries. Ms. Lewis and her friends walked over to the beach stage where most of the early artists were playing. It was rainy and muddy, and everyone looked miserable. At one point, Ms. Lewis found herself standing in front of a group of security guards discussing the impending, difficult process of getting all the attendees out of the festival. One of the security guards suggested they all "get out of dodge" before riots ensued, and the rest nodded in agreement. At that point, Ms. Lewis started to have a full-on, uncontrollable panic attack. Her boyfriend took her to find the medical tent, which happened to be far away from all the stages. When they got there, the tent was empty, not a single medical professional was in sight. Ms. Lewis' panic attack then intensified, so she went back to the cabin where she eventually recovered.

81.    Before Ms. Lewis and her friends left the cabin again to attempt to watch the final musical act sets, there was a knock on their door. To their shock, it was one of the DJ's who had played earlier that day. He told Ms. Lewis and her friends he couldn't get out of the grounds and asked if he could tag along with them for the night. He also told Ms. Lewis and her friends he wasn't the only artist with grievances. Like the attendees' experience, many of the artists had to wait several hours to get into the festival and their accommodations were far away and difficult to access. Thereafter, Ms. Lewis' most vivid memory of her last night at Elements Festival was

watching a disturbing number of people use the bathroom outside to avoid the overflowing porta-potties. The porta-potties had not been emptied the entire festival, and the smell was both horrible and inescapable, like all the trash littering the grounds.

82.    At that point, Ms. Lewis and her friends felt forced to skip the last few musical act sets of the night to get some sleep so they could be up at 5:00 a.m. Monday September 6 to catch the first shuttle bus out of the festival. When they arrived at the parking lot to leave, it was even more muddy than on arrival day.  Ms. Lewis and her friends helped a few other attendees push their cars out and received help from other attendees in return. After a long journey back to Austin, Texas, Ms. Lewis sent Elements Festival an email requesting a refund for her Gold Parking pass because Gold Parking did not even exist at the festival. As of the date of this filing, Elements Festival has never responded. Two weeks later, Ms. Lewis submitted a dispute with her bank related to the $149.00 she had spent on Gold Parking. Shortly thereafter, Ms. Lewis received a call from her bank that Elements Festival had disputed her dispute, which is still outstanding to date.  On social media, Ms. Lewis has read countless stories of other attendees being seriously injured, of sexual assault, theft, and COVID-19 cases. Ms. Lewis also received an email from Elements apologizing for the event but blaming the problems on the hurricane. Laughably, Elements also offered Ms. Lewis and her friends a 33% discount off their tickets for next year's festival, which is completely unacceptable to Ms. Lewis.

## CLASS ACTION ALLEGATIONS

83.    Plaintiffs bring this action, on behalf of themselves and all others similarly situated, as a class action pursuant to Fed. R. Civ. P. 23(b (2) and (b) (3), as applicable, and (c)(4). Upon information and belief, the Defendants sold thousands of Elements Festival tickets. The advertising and representations for the Elements Festival tickets and associated items were uniform throughout

the class period.

84.     Pursuant to Fed. R. Civ. P. 23(b) (2) and (b) (3), as applicable, and (c)(4), Plaintiffs seek certification of the following class: All persons who purchased tickets to and/or attended the Elements Festival (the "Class").

85.     Excluded from the Class are persons who purchased the tickets for purposes of resale; any entity in which Defendants have a controlling interest, is a parent or subsidiary, or which is controlled by Defendants, as well as the officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns of Defendants. Also excluded are the judges and court personnel in this case and any members of their immediate families. Plaintiffs reserve the right to redefine the proposed Class if discovery and further investigation reveal that the Class should be expanded or otherwise modified. Plaintiffs reserve the right to establish subclasses as appropriate.

86.     This action is brought, and may properly be maintained, as a class action under Fed. R. Civ. P. Rule 23 because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable. This action satisfies the predominance, typicality, numerosity, superiority, and adequacy requirements of these provisions.

**(a) Numerosity:** The Class is so numerous that the individual joinder of all members is impractical under the circumstances of this case. While the exact number of Class members is unknown to Plaintiffs at this time, upon information and belief, thousands of people purchased tickets for, and/or attended, the Elements Festival.

(b) **Commonality**: Common questions of law and fact exist as to all members of the plaintiff class and predominate over any questions that affect only individual members of the Class. The common questions of law and fact include, but are not limited to:

> (i)    Whether Defendants made false representations about the Elements Festival, including misrepresenting the musical acts that would perform at the

Elements Festival and concealed, suppressed and omitted material facts, such as the festival's inadequate infrastructure and staffing, and the lack of preparedness of accommodating persons at the Elements Festival, and whether Defendants created an unsafe environment for attendees;

(ii) If so, whether Defendants knew or should have known that their representations  were false or were reckless as to their veracity at the time they were made and their omissions material;

(iii) Whether Defendants negligently misrepresented various facts regarding the Elements Festival or were otherwise negligent or grossly negligent; and

(iv) Whether Defendants breached any implied or explicit contractual obligations to ticket buyers and to attendees of Elements Festival;

(v)  Whether Defendants violated various consumer protection statutes;

(vi) Whether Defendants created an unsafe environment at the Elements Festival; and

(vii) Whether, as a result of Defendants' misconduct as alleged herein, Plaintiffs and the Class are entitled to damages, restitution and/or other remedies to which Class members are entitled as a result of Defendants' wrongful conduct, and, if so, the amount and nature of such relief.

(c) **Typicality:** Plaintiffs' claims are typical of the claims of the Class. Plaintiffs and the members of the Class sustained damages arising out of Defendants' wrongful and fraudulent conduct as alleged herein.

(d) **Adequacy:** Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have no interest that is adverse to the interests of the other Class Members.

(e) **Superiority:** A class action is superior to other available means for the fair and efficient adjudication of this controversy. Because individual joinder of all members of the class is impractical, class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without unnecessary duplication of effort and expense that numerous individual actions would engender. The expenses and burdens of individual litigation would make it difficult or impossible for

individual members of the class to redress the wrongs done to them, while important public interests will be served by addressing the matter as a class action. The cost to and burden on the court system of adjudication of individualized litigation would be substantial, and substantially more than the costs and burdens of a class action. Class litigation would also prevent the potential for inconsistent or contradictory judgments.

## **CAUSES OF ACTION**

### **FIRST CAUSE OF ACTION**
**(Negligence)**

87.     Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

88.     Plaintiffs bring this claim individually and on behalf of the members of the Class against Defendants.

89.     Defendants owed duties to Plaintiffs and the members of the Class as paying customers and attendees of the Elements Festival to use reasonable care to provide true, reliable and safe accommodations of food, water, shelter, and security at the Elements Festival. These duties existed because Plaintiffs and members of the Class were the foreseeable and probable victims of the inadequate and unsafe environment that Defendants created. Defendants' duties also arose from their position of having unique and superior knowledge about the environment at the Elements Festival and they had a duty to Plaintiffs to not place them in a unsafe situation without adequate safety protocols related to COVID-19 and in unsanitary conditions without adequate access to supplies such as drinking water. These duties are independent of and extraneous to any contractual obligations that may exist between Elements Production and Plaintiffs.

90.     Defendants, breached their duties to Plaintiffs and the members of the Class by failing to provide adequate safety protocols related to COVID-19 and reasonable access to water at

the Elements Festival, by failing to use reasonable care in properly organizing Elements Festival with the proper vendors, by placing attendees into a dangerous environment, and by making false representations and concealing, suppressing and omitting material information about the experience they would provide.

91.    Plaintiffs and members of the Class suffered foreseeable pecuniary and non-pecuniary damages associated with the Elements Festival.

92.    But for Defendants' wrongful and negligent breach of their duties owed to Plaintiffs and members of the Class, Plaintiffs and members of the Class would not have suffered pecuniary and non-pecuniary damages.

93.    As a direct and proximate result of Defendants' negligence, Plaintiffs and the members of the Class incurred pecuniary and non-pecuniary damages, such as pain and suffering and emotional distress, in an amount to be determined at trial.

<u>SECOND CAUSE OF ACTION</u>
**(Gross Negligence)**

94.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

95.    Plaintiffs bring this claim individually and on behalf of the members of the Class against Defendants.

96.    Defendants owed duties to Plaintiffs and the members of the Class as paying customers and attendees of the Elements Festival to use reasonable care to provide adequate safety protocols related to COVID-19 and reasonable access to water at the Elements Festival. These duties existed because Plaintiffs and members of the Class were the foreseeable and probable victims of the inadequate and unsafe environment that Defendants created. Defendants' duties also arose from their unique position of having unique and superior knowledge about the environment

at the Elements Festival and they had a duty to Plaintiffs to not place them in a unsafe situation without adequate safety protocols related to COVID-19 and reasonable access to water. These duties are independent of and extraneous to any contractual obligations that may exist between Defendants and Plaintiffs.

97.    Defendants breached their duties to Plaintiffs and the members of the Class by failing to provide adequate safety protocols related to COVID-19 and reasonable access to water at the Elements Festival, by failing to use reasonable care in properly organizing Elements Festival with the proper vendors, by placing attendees into unsafe environment, and by making false representations and concealing, suppressing and omitting material information about the experience they would provide.

98.    Plaintiffs and members of the Class suffered foreseeable pecuniary and non-pecuniary damages associated with the Elements Festival.

99.    But for Defendants' wrongful and grossly negligent breach of their duties owed to the Plaintiffs and members of the Class, Plaintiffs and members of the Class would not have suffered pecuniary and non-pecuniary damages.

100.    Defendants' acts and omissions were wanton and in disregard of the rights of Plaintiffs and members of the Class. Defendants knowingly and deliberately placed Plaintiffs and members of the Class in an inadequate or unsafe environment without adequate provisions.

As a direct and proximate result of Defendants' gross negligence, Plaintiffs and the members of the Class, incurred pecuniary and non-pecuniary damages, such as pain and suffering and emotional distress, in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
#### (Fraud)

101.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing

allegations as though fully set forth herein.

102.    Plaintiffs bring this claim individually and on behalf of the members of the Class against Defendants.

103.    As alleged herein, Defendants made numerous false representations of material fact with regard to the Elements Festival.

104.    Specifically, Defendants represented, among other things, that:  (1) for safety purposes related to COVID-19, to gain entrance to Elements Festival, attendees would be required to show proof of full vaccination or a negative PCR lab test within 72 hours of the event, in conjunction with a valid ID to access the festival entrance (2) musical acts, such as, without limitation, Esseks, Dessert Dwellers, J. Worra, and Oona Ogal, among others, would be performing as advertised from 1:00 p.m. to 11:00 p.m. each day of the festival (3) free water stations would be available to attendees (4) "Group Camping" was available for groups that met a minimum number of attendees and paid an extra $5 per attendee in the group, with a dedicated on-site manager assigned  (5) "Premium Camping" was available for attendees who paid extra for premium passes, which was an exclusive, separate area from general admission camping and required a specific wristband for entry into, and also included indoor showers and indoor restrooms, and (6) Elements Festival would be an ADA accessible event to accommodate attendees with disabilities.

105.    Defendants' representations were false when made.

106.    Defendants knew these representations were false when made, and at the time of making these representations, Defendants knew that they could not and would not provide the goods and services that they had represented to Plaintiffs and consumers. The representations made by the Defendants were made with a preconceived and undisclosed intention to not perform them.

107.    Defendants intended that the representations would induce the consuming public, including Plaintiffs and the Class, to act on these representations and to, among other things, purchase tickets to Elements Festival and incur other related expenses in connection with the Elements Festival.

108.    Defendants also concealed, suppressed and omitted material facts to the Plaintiffs and the members of the Class, that Defendants' had a duty to ticketholders and attendees to disclose, including, among other things, about the lack of preparedness of parking, accommodations, sanitation, and other provisions at the Elements Festival, lack of adequate screening for COVID-19, and that Defendants had created an unsafe environment at the Elements Festival.

109.    Plaintiffs and the members of the Class acted in reliance on the false, material representations and omissions made by Defendants, by buying tickets associated with the Elements Festival, which caused them injury. Plaintiffs and the members of the Class would not have purchased tickets and/or expended any other money in connection with the Elements Festival if they had known that they were not going to be receiving the security, accommodations, performances, and other amenities they were told they were going to have access to at the Elements Festival.

110.    Plaintiffs and the members of the Class were consequently injured when Elements Festival's disorganized parking and lack of adequate staffing led to waits of up to more than ten hours on the festival's first day, just to get through the entry on the festival's first day, due to under-preparation, insufficient staffing, and inadequate facilities, and then once in the festival did not receive the security, accommodations, performances, and other amenities they were told they were going to have access to at the Elements Festival.

111.    As a result of Defendants' fraudulent representations and omissions, Plaintiffs and

the members of the Class were damaged in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION

### (Negligent Misrepresentation)

112.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

113.    Plaintiffs bring this claim individually and on behalf of the members of the Class against Defendants.

114.    As alleged herein, Defendants made numerous false representations of material fact with regard to Elements Festival.

115.    Specifically, Defendants represented, among other things, that:  (1) for safety purposes related to COVID-19, to gain entrance to Elements Festival, attendees would be required to show proof of full vaccination or a negative PCR lab test within 72 hours of the event, in conjunction with a valid ID to access the festival entrance (2) musical acts, such as, without limitation, Esseks, Dessert Dwellers, J. Worra, and Oona. Ogal., among others, would be performing as advertised from 1:00 p.m. to 11:00 p.m. each day of the festival (3) free water stations would be available to attendees (4) "Group Camping" was available for groups that met a minimum number of attendees and paid an extra $5 per attendee in the group, with a dedicated on-site manager assigned  (5) "Premium Camping" was available for attendees who paid extra for premium passes, which was an exclusive, separate area from general admission camping and required a specific wristband for entry into, and also included indoor showers and indoor restrooms, and (6) Elements Festival would be an ADA accessible event to accommodate attendees with disabilities.

116.    Defendants' representations were false at the time that they were made

117.    Defendants were negligent in making the representations because they should they should have known the representations were false. Defendants should have known that they could not and would not provide the goods and services that they had represented to Plaintiffs and consumers.

118.    Defendants intended for the representations to induce the consuming public, including Plaintiffs and the Class, to act on these representations and to, among other things, purchase tickets to Elements Festival and incur other related expenses in connection with the Elements Festival.

119.    Plaintiffs and the members of the Class acted in reliance on the false, material representations made by Defendants, by buying tickets associated with the Elements Festival, which caused them injury. Plaintiffs and the members of the Class would not have purchased tickets and/or expended any other money in connection with the Elements Festival if they had known that they were not going to be receiving the security, accommodations, performances, and other amenities they were told they were going to have access to at the Elements Festival.

120.    Plaintiffs and the members of the Class were consequently injured when Elements Festival's disorganized parking and lack of adequate staffing led to waits of up to more than ten hours on the festival's first day, just to get through the entry on the festival's first day, due to under-preparation, insufficient staffing, and inadequate facilities, and then once in the festival did not receive the security, accommodations, performances, and other amenities they were told they were going to have access to at the Elements Festival.

121.    As a result of Defendants' fraudulent representations and omissions, Plaintiffs and the members of the Class were damaged in an amount to be proven at trial.

**FIFTH CAUSE OF ACTION**
**(Breach of Contract/Third Party Beneficiaries As Against Elements Production, Herman, and Monkiewicz Only)**

122.    Plaintiffs reallege and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

123.    Plaintiffs bring this claim individually and on behalf of the members of the Class against Defendants Elements Production, Herman and Monkiewicz.

124.    Plaintiffs and the members of the Class entered into contracts with Elements Production, Herman and Monkiewicz to provide a three day camping and musical festival for money. Plaintiffs who purchased tickets to Elements Festival provided payment in consideration for Elements Production's, Herman's, and Monkiewicz's promise to provide a safe and secure music festival with specified musical performers, and otherwise fully performed their obligations under the contracts. Plaintiffs who attended the Elements Festival with tickets purchased by others, and expended monies associated with the Elements Festival, such as travel and other accommodations, are third party beneficiaries of ticket purchasers' contracts as those contracts were made to benefit such attendees, and fully performed any obligations on their behalf.

125.    As alleged herein, Defendants Elements Production, Herman and Monkiewicz breached the contracts with Plaintiffs and the members of the Class by, among other things, failing to provide adequate parking, reasonable access to the festival's first day, adequate COVID-19 screening, sufficiently accessible water, specified musical acts and reasonable access to their vehicles for a timely departure.

126.    Plaintiffs and the members of the Class expended money to purchase their tickets and/or associated items with the Elements Festival.

127.    As a direct and proximate result of Defendant Elements Production's, Herman's,

and Monkiewicz's breach of contract, Plaintiffs and the members of the Class were damaged in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION
### (Breach of Implied Covenant of Good Faith and Fair Dealing As Against Elements Production, Herman, and Monkiewicz Only)

128.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

129.    Plaintiffs bring this claim individually and on behalf of the members of the Class against Elements Production, Herman and Monkiewicz.

130.    Plaintiffs and the members of the Class entered into direct and/or third party beneficiary contracts with Elements Production, Herman and Monkiewicz to provide a three day camping and musical festival for money. Plaintiffs who purchased tickets to Elements Festival provided payment in consideration for Elements Production's, Herman's and Monkiewicz's promise to provide a safe and secure music festival with specified musical performers, and otherwise fully performed their obligations under the contracts.

131.    As alleged herein, Elements Production's, Herman's and Monkiewicz's acts and omissions and failure to failing to provide adequate parking, reasonable access to the festival's first day, adequate COVID-19 screening, sufficiently accessible water, specified musical acts and reasonable access to their vehicles for a timely departure interfered with Plaintiffs and the members of the Class right to receive the benefits of the contracts and constituted a breach of its duty of good faith with Plaintiffs and members of the Class.

132.    Plaintiffs and the members of the Class expended money to purchase their tickets and other items associated with the Elements Festival.

133.    As a direct and proximate result of Elements Production's, Herman's and

Monkiewicz's breach of the implied covenant of good faith and fair dealing, Plaintiffs and the members of the Class were damaged in an amount to be proven at trial.

**SEVENTH CAUSE OF ACTION**
**(Unjust Enrichment)**

134.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

135.    Plaintiffs bring this claim individually and on behalf of the members of the Class against Defendants.

136.    By their wrongful acts and omissions regarding the Elements Festival, as discussed above, Defendants were unjustly enriched at the expense of Plaintiffs and the members of the Class, who did not receive the benefit for which they were promised and they were entitled – as alleged in detail above – for attendance to the advertised music and camping festival, and thus, Plaintiffs and the members of the Class were unjustly deprived.

137.    Defendants were enriched by, among other things, the financial benefit from sales of tickets to, and associated items for, the Elements Festival, and for services they were supposed to but not did provide.

138.    It would be inequitable and unconscionable for Defendants to retain the profit, benefit and other compensation it obtained from its deceptive, misleading, and unlawful conduct alleged herein.

139.    Plaintiffs and the members of the Class seek restitution from Defendants, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by Elements Production from its wrongful conduct.

## EIGHTH CAUSE OF ACTION
### (Violation of N.Y. Gen Bus. Law § 349, *et seq*.)

140.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

141.    Plaintiffs bring this cause of action on behalf of themselves and all of the members of the Class as the deceptive practices with respect to the entire Class occurred in and emanated from New York, where Elements Production, Herman, and Monkiewicz were headquartered, conducted business and/or had extensive ties.

142.    Plaintiffs and members of the Class are individuals that paid for Elements Festival tickets and other associated items with the Elements Festival for personal purposes.

143.    Defendants engaged in deceptive acts or practices in the conduct of their business, trade, and commerce or furnishing of services, in violation of N.Y. Gen. Bus. Law § 349 in the promotion of the Elements Festival and sale of the Elements Festival tickets and other associated items with the Elements Festival, including by misrepresenting the characteristics, and qualities of the Elements Festival as alleged herein,  such as representing that: (1) for safety purposes related to COVID-19, to gain entrance to Elements Festival, attendees would be required to show proof of full vaccination or a negative PCR lab test within 72 hours of the event, in conjunction with a valid ID to access the festival entrance (2) musical acts, such as, without limitation, Esseks, Dessert Dwellers, J. Worra, and Oona Ogal, among others, would be performing as advertised from 1:00 p.m. to 11:00 p.m. each day of the festival (3) free water stations would be available to attendees (4) "Group Camping" was available for groups that met a minimum number of attendees and paid an extra $5 per attendee in the group, with a dedicated on-site manager assigned  (5) "Premium Camping" was available for attendees who paid extra for premium passes, which was an exclusive, separate area from general admission camping and required a specific wristband for entry into, and

also included indoor showers and indoor restrooms, and (6) Elements Festival would be an ADA accessible event to accommodate attendees with disabilities.

144.    Defendants engaged in deceptive acts or practices in the conduct of their business, trade, and commerce or furnishing of services, in violation of N.Y. Gen. Bus. Law § 349 by concealing, suppressing and omitting material facts, including, among other things, about the lack of preparedness of parking, accommodations, sanitation, and other provisions at the Elements Festival, lack of adequate screening for COVID-19, and that Defendants had created an unsafe environment at the Elements Festival.

145.    Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the characteristics and quality of the Elements Festival.

146.    Defendants acted intentionally, knowingly, and maliciously to violate New York's General Business Law, and recklessly disregarded Plaintiffs and the rights of the Plaintiffs and the Class.

147.    As a direct and proximate result of Defendants' deceptive and unlawful acts and practices, Plaintiffs and the members of the Class have suffered and will continue to suffer injury and damages.

148.    Defendants' deceptive and unlawful acts and practices complained of herein, affected the public interest and consumers at large.

149.    The above deceptive and unlawful practices and acts by Defendants caused substantial injury to Plaintiffs and the members of the Class that they could not reasonably avoid.

150.    Plaintiffs and members of the Class seek all monetary and non-monetary relief allowed by law, including, per class member, actual damages or statutory damages of $50 (whichever is greater), treble damages, attorney's fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seeks a judgment against Defendants, as follows:

A.     For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Class and the undersigned lead-counsel as Class Counsel to represent the Class;

B.     For an order declaring that Defendants' conduct violates the statutes referenced herein;

C.     For an order finding in favor of Plaintiffs and the Class on all causes of action asserted herein;

D.     For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

E.     For prejudgment interest on all amounts awarded;

F.     For an order of restitution and all other forms of equitable monetary relief; and

G.     For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit.

## <u>JURY TRIAL DEMAND</u>

Plaintiffs demand a trial by jury on all causes of action and issues so triable.


Dated: April 22, 2022                                    Respectfully submitted,

                                                          By: _s/_____

                                                          TINA GLANDIAN
                                                          **GERAGOS & GERAGOS, APC**

                                                          New York, New York 10010
                                                          Telephone: (213) 625-3900
                                                          Facsimile: (213) 232-3255


                                                          MARK J. GERAGOS
                                                          **GERAGOS & GERAGOS, APC**
                                                          Historic Engine Co. No. 28
                                                          644 South Figueroa Street
                                                          Los Angeles, CA 90017
                                                          Telephone: (213) 625-3900
                                                          Facsimile: (213) 232-3255
                                                          geragos@geragos.com

                                                          MICHAEL LOUIS KELLY
                                                          CONNOR M. KAREN
                                                          **KIRTLAND & PACKARD LLP**
                                                          1638 South Pacific Coast Highway
                                                          Redondo Beach, CA 90277
                                                          Telephone: (310) 536-1000
                                                          Facsimile: (310) 536-1001

                                                          *Counsel for Plaintiffs on behalf of*
                                                          *themselves and all others similarly situated*